Rajesh **SAKHRANI**, et al., Plaintiffs,

v.

**BRIGHTPOINT, INC.,**
et al., Defendants.

Jack Clark, et al., Plaintiffs,

v.

Brightpoint, Inc., et al., Defendants.

Gertrude Sendermair, et al., Plaintiffs,

v.

Brightpoint, Inc., et al., Defendants.

Lynn Desrosiers, et al., Plaintiffs,

v.

Brightpoint, Inc., et al., Defendants.

Nos. IP–99–870–C H/G, IP–99–1157–C H/G, IP–99–943–C H/G and IP–99–1138–C H/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Dec. 8, 1999.

Kevin J. Yourman, Weiss & Yourman, Los Angeles, CA, Michael D. Braun, Stull Stull & Brody, Los Angeles, CA, James A. Knauer, Kroger Gardis & Regas, Indianapolis, IN, William C. Potter, II, Price, Potter & Mellowitz, Indianapolis, IN, for plaintiffs.

James H. Ham, III, Baker & Daniels, Indianapolis, IN, Ira A. Finkelstein, Tenzer Greenblatt LLP, New York City, for defendants.

ENTRY ON MOTIONS FOR APPOINTMENT OF LEAD PLAINTIFFS AND APPOINTING COUNSEL FOR PUTATIVE CLASS

HAMILTON, District Judge.

Like many recent putative class actions alleging securities fraud, these consolidated cases illustrate the law of unintended consequences. The principal issue is the selection of a "lead plaintiff" under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4(a)(3). The specific problem is whether a number of investors who have nothing in common other than their investment in a defendant's securities may aggregate their individual losses to form a "group of persons" with the greatest financial interest in the case so that, as a group, they are presumed under the PSLRA to be the most adequate representative(s) of the proposed class.

The PSLRA by its terms authorizes appointment of a "group of persons." 15

U.S.C. § 78u–4(a)(3)(B)(iii)(I). Such an appointment may be entirely appropriate where the group consists of investors who have prior relationships independent of the lawsuit, such as family members who manage investments jointly, or affiliated pension funds or mutual funds under common management. Where the members of the group do not share business or other relationships independent of the lawsuit, however, this court concludes that appointment of such an artificial group of persons as lead plaintiffs should be rare under the PSLRA.

The plain language of the PSLRA does not require such appointments, and in most situations the appointment of an artificial group as lead plaintiffs will tend to undermine the goals of the PSLRA. Some courts have held otherwise, however, and have given substantial or even controlling weight to the aggregation of losses by large, artificial groups of investors. The unintended results have been to generate a flurry of otherwise pointless activity that adds nothing to the prompt and fair resolution of disputes, and to create powerful incentives for lawyers competing to represent the class to solicit clients and to create misleading forms of notice under the PSLRA that prompt plaintiffs to "volunteer" as lead plaintiffs when they think they are merely providing notice to preserve their claims.

The PSLRA simply does not require courts to reward lawyers' efforts to aggregate the losses of scores, hundreds, or even thousands of class members as proposed artificial "groups" of lead plaintiffs. Courts should give such efforts no weight in selecting lead plaintiffs under the PSLRA, including selections of smaller "subgroups" as representatives of much larger artificial groups. There is certainly no reason to make such an appointment of an artificial group or subgroup as lead plaintiff in this case. Accordingly, the court names only one lead plaintiff in this case, John Kilcoyne, who is the individual investor with the largest losses during the class period.

*Factual and Procedural Background*

The court has consolidated several related securities fraud actions filed as putative class actions against Brightpoint, Inc. and several of its officers. The four consolidated actions here allege that defendant Brightpoint, Inc. and several of its officers violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated under the act. The complaints allege that between October 2, 1998, and March 10, 1999, the defendants made false statements and misleading omissions to investors about the financial condition and business prospects of Brightpoint. The complaints allege that the false statements and omissions had the effect of inflating the price of Brightpoint stock until the company disclosed negative financial information on March 10, 1999. During the class period of October 2, 1998, to March 10, 1999, Brightpoint shares traded at a high of $19.94. On March 10, 1999, the stock closed at $13.06. The next day, after the company's announcement, the stock price dropped to $6.00 per share.

After the first of the pending actions was filed, the plaintiffs published national notice of the action as required by the PSLRA. See 15 U.S.C. § 78u–4(a)(3)(A). Three parallel actions were filed in this district over the next few weeks. The court then consolidated those actions pursuant to the PSLRA. See 15 U.S.C. § 78u–4(a)(3)(B)(ii).

Pursuant to the PSLRA, the next phase of the case is selection of a lead plaintiff. At this point, two principal groups of investors are competing for appointment as lead plaintiffs. Each group has its preferred counsel. The court held a hearing on the motions on September 10, 1999. One of the competing groups and their counsel modified their proposal so as to designate a much smaller "subgroup" of lead plaintiffs. The court then directed both groups and their preferred counsel to submit additional information after the hearing. The court orally directed each member of each proposed group of "lead

plaintiffs" to provide the following information: the person's "expectations about what he or she is getting into in acting as lead plaintiff in a case of this type in terms of working with counsel and in terms of making himself or herself available for discovery"; "something about each individual's professional and relevant educational background and investment background; in essence, elementary information about their sophistication in these sorts of matters, as well as if they have experience overseeing or working with counsel either in litigation or in other contexts"; as well as "business or personal relationships among any of those individuals" and such relationships with proposed class counsel. See Sept. 10, 1999, Transcript at 36–39. The court confirmed that directive in the written entry on the hearing.[1]

The first competing group is the "Sakhrani Group," which initially proposed that the court appoint a group of 118 individuals and businesses as "lead plaintiffs." After the court authorized a deposition of the group member with the largest stake, L.A.L.W., Inc., that plaintiff withdrew from the proposed group. In light of the obvious problems with naming 117 lead plaintiffs (a group that would satisfy the numerosity standard of Rule 23(a) all by itself), the attorneys representing the Sakhrani Group have proposed as an alternative that the court appoint a group of four individuals as lead plaintiffs: Rajesh Sakhrani, Sitaraman Jaganath, Jack Clark, and John Kilcoyne.[2]

Kilcoyne suffered a loss of approximately $54,850 on Brightpoint investments during the class period. He has owned and operated his own business since 1984, and in recent years has earned a "substantial portion" of his income from stock investments. He does not have prior litigation experience but has consulted with lawyers in the past for his business. He does not have prior business or personal relationships with any of the other proposed class representatives or counsel.

Sitaraman Jaganath is a named plaintiff in the first-filed action here. He estimates his losses during the class period as $16,090. He is a chemical engineer. He says he has traded a number of securities over the past 10 years, and rates his investment experience as a 5 on a scale of 1 to 10. He does not have prior business or personal relationships with other proposed lead plaintiffs or counsel.

Jack Clark was the named plaintiff in one of the consolidated actions. His certificate filed with the complaint identified purchases of only 200 shares of Brightpoint. The court has not found in the record an estimate of Clark's losses during the class period, but they are obviously modest in light of his 200 share investment. Clark is a retired building contractor who now owns and runs a private utility company near Connersville, Indiana. He invests his retirement funds. He has prior experience working with and overseeing attorneys in his businesses. Clark is a social acquaintance of the father of one lawyer in a firm that is not actively seeking a position as lead counsel. Clark does not have other prior business or personal

---

**1.** The PSLRA directs a court dealing with two or more consolidated actions to act on the lead plaintiff question "as soon as practicable" after the actions are consolidated, but not before then. 15 U.S.C. § 78u-4(a)(3)(B)(ii). By order dated August 20, 1999, the court consolidated these actions and scheduled the September 10, 1999, hearing. The court has now had an opportunity to review the additional information submitted after the hearing.

**2.** Actually, the subgroup as initially proposed also included Gertrude Sendermair, but on September 10, 1999, she filed notice of her withdrawal of support for the Sakhrani Group. The court has no further information on the reasons for the falling out. For reasons explained further below, however, the shifting membership and alliances provide good evidence that this is not the sort of "group of persons" contemplated by the PSLRA. See *Switzenbaum v. Orbital Sciences Corp.*, 187 F.R.D. 246, 250–51 (E.D.Va.1999) (finding that similar uncertainties about membership of proposed artificial "group" undermined group's credibility as class representative).

relationships with other proposed class representatives or counsel.

Rajesh Sakhrani is the first-named plaintiff in the first case filed here. He estimates his losses during the class period at less than $1200. He is an auditor and accountant; he has studied finance and investing in college and has invested personal assets. Sakhrani has some experience working with attorneys in his work as an auditor and accountant. He also does not have prior business or personal relationships with other proposed class representatives or counsel.

The competing group seeking the role of lead plaintiff is the "Desrosiers Group," which hopefully calls itself the "Brightpoint Shareholders Representative Group." The Desrosiers Group initially proposed that the court appoint a group of 12 individuals and trusts as lead plaintiffs.

The investor claiming the largest losses in the Desrosiers Group is Dr. Arthur Levin, who claims losses either in his own right or as a trustee totaling about $55,000, without indicating how he calculated that amount. Counsel for the Sakhrani Group estimated Dr. Levin's total loss to be $52,-053. Dr. Levin invests for himself and for other family members.[3] Dr. Levin is a physician who works for an insurance company. Dr. Levin has not complied with the court's direction to provide information about prior business or personal relationships with other proposed class representatives or counsel.

Lynn Desrosiers is the named plaintiff in one of the consolidated actions. He retired from GTE in 1992 and has invested his retirement settlement since that time. He calculates his loss as $25,007.04, or about 5 percent of his portfolio value at the time. He also has not complied with the court's direction to provide information about prior business or personal relation-

ships with other proposed class representatives or counsel.

Another member of the Desrosiers Group, Brett Bauman, has submitted a statement concerning his views on the securities market and reports about his family situation, but he has not provided any of the supplemental information the court directed.

The information from Dr. Levin, Desrosiers, and Bauman was inadequate but was at least timely. In response to the court's directions at the hearing on September 10, 1999, the Desrosiers Group's response filed on the due date, October 1, 1999, included incomplete information from those three "members" of the group, and the response noted that other members had not yet responded to counsel's requests for information to comply with the court's directive. Counsel asked the court's "indulgence" to allow submission of late responses. On October 6, 1999, the Desrosiers Group submitted letters from two more proposed lead plaintiffs, Sandra Kunz and Warren Worster. Neither letter provided the information that was directed. The other members of the Desrosiers Group, at least as originally proposed, have not submitted any response. In addition, it should be noted that the Desrosiers Group has submitted no specific information about the estimated losses about any of the other proposed individual members.

## Discussion

### I. "Lead Plaintiffs" Under the Private Securities Litigation Reform Act

In 1995 Congress enacted the PSLRA, which established new standards and procedures for selecting lead plaintiffs and lead counsel in class actions alleging violations of securities laws. The key PSLRA

---

3. In light of Dr. Levin's common control and the prior relationships among the investors, aggregation of such interests is entirely appropriate for determining lead plaintiff status under the PSLRA. See, e.g., In re Telxon Corp. Securities Litigation, 67 F.Supp.2d 803, 823 (N.D.Ohio 1999) (naming two brothers as lead plaintiffs); In re Milestone Scientific Securities Litigation, 183 F.R.D. 404, 418 (D.N.J.1998) (appointing group of family members and related trusts as lead plaintiffs).

provisions amending the Securities Exchange Act of 1934 are codified in 15 U.S.C. § 78u–4, also referred to as Section 21D of the Securities Exchange Act of 1934.

Under the PSLRA, a plaintiff filing a new putative class action alleging securities fraud must provide a national notice to members of the proposed class informing them of the case, the claims asserted, the relevant claims period, and their right to move the court to serve as lead plaintiff. 15 U.S.C. § 78u–4(a)(3)(A)(i). The PSLRA also provides for consolidation of parallel cases. 15 U.S.C. § 78u–4(a)(3)(A)(ii) & (B)(ii).

After the national notice provides an opportunity for other plaintiffs to step forward, and after the court consolidates parallel actions, the court "shall" appoint "the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." 15 U.S.C. § 78u–4(a)(3)(B)(i). The lead plaintiff has the power, subject to approval of the court, to select and oversee lead counsel. The lead plaintiff can also expect to play a key role in making decisions about settlement negotiations.

## II. Aggregating the Losses of "Groups of Persons" to Select Lead Plaintiffs Under the PSLRA

The critical issue in this case is application of the PSLRA provision authorizing selection of a "group of persons" as lead plaintiffs. See 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). The statute provides that the court shall presume that the most adequate plaintiff will be:

the person or group of persons that -

(aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);

(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). This presumption may be rebutted with evidence that the persons in question will not fairly and adequately protect the interests of the class or are subject to unique defenses that render them incapable of adequately representing the class. 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II).

In applying these provisions, it is helpful to understand the goals they were designed to achieve. These provisions of the PSLRA were designed to avoid situations in which a named class representative has a minimal financial stake in the case and acts primarily as a tool of the lawyers who may well have recruited him. The PSLRA was enacted with the explicit hope that institutional investors, who tend to have by far the largest financial stakes in securities litigation, would step forward to represent the class and exercise effective management and supervision of the class lawyers. See House Conf. Rep. No. 104–67 at 34–35, reprinted in 1995 U.S.C.C.A.N. 679, 733–34; see also Sen. Rep. No. 104–98 at 10–11, reprinted in 1995 U.S.C.C.A.N. 679, 689–90, citing Weiss and Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 Yale L.J.2053 (1995); accord, *e.g.*, *Ravens v. Iftikar*, 174 F.R.D. 651, 661–62 (N.D.Cal.1997); *Gluck v. Cellstar Corp.*, 976 F.Supp. 542, 548 (N.D.Tex.1997); Memorandum of Securities and Exchange Commission, Amicus Curiae, *In re Baan Co. Securities Litigation*, 186 F.R.D. 214, 218 (D.D.C.1999) (printed as appendix to court opinion).

The goal of the PSLRA has not been realized in this case. No institutional investors have stepped forward to take over this case. Where institutional investors have not accepted the congressional invitation to take leadership roles in securities class actions, the law of unintended consequences has come into play, and this case provides a modest example.

Relying on the PSLRA provision permitting appointment of a "group of per-

sons" as lead plaintiff, enterprising counsel have competed with one another to collect scores, hundreds, sometimes even thousands of volunteers to serve as class representatives as each law firm tries to assemble the largest possible group with the largest possible aggregate losses. See, *e.g., In re Baan Co. Securities Litigation,* 186 F.R.D. at 217(group of 466 members); *In re Advanced Tissue Sciences Securities Litigation,* 184 F.R.D. 346, 347–48 (S.D.Cal.1998) (one group of over 250 plaintiffs had larger aggregate losses than group of 165 plaintiffs); *Chill v. Green Tree Financial Corp.,* 181 F.R.D. 398, 408–09 (D.Minn.1998) (group of about 300 members). The volunteers are often collected by inviting investors who read the national notice under the PSLRA to send in a form to a law firm. Evidence in the record in this case indicates that at least some investors who send in such forms believe they are merely taking minimal, required steps to preserve their claims, not volunteering to take on the leadership of a nationwide class with thousands of members or more.

Among the more extreme examples of these tactics is *In re Network Associates, Inc. Securities Litigation,* 76 F.Supp.2d 1017, 1018–19 (N.D.Cal.1999), where one group of lawyers offered a group of more than 1,725 investors as "lead plaintiffs," and a competing group of lawyers offered a group of "over 100 institutions and thousands of individuals" as "lead plaintiffs." (The court firmly rejected both proposals, as well as each group's proposal for a "subgroup" to act as lead counsel, and instead appointed one institutional investor as the lead plaintiff.) Similarly, in *Aronson v. McKesson HBOC,* Inc., Fed. Sec. L. Rep. P 90694, C–99–20743 (N.D.Cal. Nov. 2, 1999) (available at <http://securities.stanford.edu/decisions/mck/99cv20743/991102or.html> as of Dec. 2, 1999), "groups as large as 4,000 plaintiffs strong" were vying for appointment as "lead plaintiffs."

Why has this been happening? Several court decisions have created incentives for lawyers to manipulate artificial "groups" to obtain lead plaintiff (and lead counsel) status. One example is *In re Informix Corp. Securities Litigation,* No. C–97–1289 (N.D.Cal. Oct. 17, 1997) (available at <http:// securities.stanford.edu/decisions/informix/97cv01289/079.html> as of Dec. 3, 1999), in which one group of 979 persons and entities competed for lead plaintiff status with another group of 274 persons and entities with smaller aggregate losses. The two competing groups also proposed subgroups of nine or six investors. To illustrate the kinds of disputes that can arise when large, artificial groups and subgroups vie for appointment as lead plaintiffs, the smaller group argued that the average loss of the six members in its subgroup was greater than the average loss of the nine members in the larger group's proposed subgroup. The district court did not sort out that nuance, but found that the "plain meaning of the PSLRA" entitled the group with the larger aggregate losses to the presumptive position as "lead plaintiff."

Similarly, in *In re Advanced Tissue Sciences,* 184 F.R.D. 346 (S.D.Cal.1998), two artificial groups of unrelated investors competed for lead plaintiff status. One group had more than 250 members and the other had about 165 members. The court appointed a subgroup of six members of the larger group based on the larger group's aggregate losses. Neither group challenged the use of aggregate losses in determining the statutory presumption. See 184 F.R.D. at 350 n. 11 (acknowledging split of authority on aggregation of losses).

Another decision creating similar incentives is *In re Ride, Inc. Securities Litigation,* No. C97–402WD (W.D.Wash. Aug. 5, 1997). There one group of 17 investors had purchased a total of 60,104 shares, and their single largest investor had bought 9000 shares. Another group had just two investors who had bought a total of 40,024 shares. One of the two had bought 36,024 shares and had suffered by far the largest individual losses of any of those volunteer-

ing to serve as lead plaintiff. The court found that the "plain wording" of the statute required it to give the statutory presumption to the group of 17 based on their aggregate losses. There is no indication from the court's opinion that the members of that group had any shared relationship beyond their investment in the same stock.

Another decision creating similar incentives involved smaller numbers and a more elegant presentation of the problem. In *In re Diamond Multimedia Systems, Inc. Securities Litigation*, No. C–96–2644, 1997 WL 773733 (N.D.Cal. Oct. 14, 1997), a group of seven plaintiffs competed with one person for appointment as lead plaintiff. The one investor had suffered a greater loss than any single member of the group, but the group's aggregate losses were greater than the lone investor's. Without analysis, the court concluded that the group's aggregate losses entitled it to the statutory presumption. There was no indication that the members of the group had any relationships independent of the lawsuit itself.[4]

The recent opinions in *Network Associates* and in *Aronson* have surveyed the case law applying the PSLRA to proposed groups of lead plaintiffs. The court noted in *Aronson* that one reading of the provision is that "Congress failed to legislate what it meant, and that any conglomeration will do," which is at least not facially inconsistent with any statutory provisions. Another approach is to allow aggregation of losses, but, only when necessary to address the existence of intra-class periods or if needed to help assure effective plaintiff control over lead counsel. *Id.*, citing *Wenderhold v. Cylink Corp.*, 188 F.R.D. 577, 586 (N.D.Cal.1999). A more strict approach limits the term "group" to a small number of investors who have had a significant relationship preceding and independent of the litigation in question. *Aronson,*, citing *In re Telxon Corp. Securities Litigation,* 67 F.Supp.2d 803, 809–813, 815 (N.D.Ohio 1999).

In *Network Associates*, the court reviewed in detail the practices of aggregating "groups" of proposed lead plaintiffs that have evolved in response to the PSLRA. The court pointed out that no court has actually designated hundreds or thousands of persons as "lead plaintiffs," but that courts in some cases had given weight to the aggregate losses of huge groups when choosing from among competing "subgroups." *Network Associates*, 76 F.Supp.2d at 1022–23, citing *In re Informix Corp. Securities Litigation*, No. C–97–1289 (N.D.Cal. Oct. 17, 1997) (appointing subgroup of nine based on aggregated losses of 979 persons and entities); *In re Read–Rite Corp. Securities Litigation*, No. C–97–20059 (N.D.Cal. May 27, 1997) (aggregating losses of proposed group, but without competing candidates for lead plaintiff); *City Nominees, Ltd. v. Macromedia*, No. C 97–3521, 1998 WL 267964 (N.D.Cal. May 18, 1998); see also *In re Advanced Tissue Sciences*, 184 F.R.D. at 350, 352 (appointing subgroup of six lead plaintiffs from group of more than 250 unrelated investors with largest aggregated losses); *Malin v. Ivax Corp.*, 17 F.Supp.2d 1345 (S.D.Fla.1998) (available on Dec. 3, 1999, at <http://securities.stanford.edu/decisions/ivax/96cv01843/961101or.html>) (aggregating losses of proposed group to determine largest financial interest).

The court in *Network Associates* agreed with the much narrower approach to a "group of persons" set forth in Judge Cedarbaum's opinion in *In re Donnkenny*

---

**4.** See also *In re Oxford Health Plans, Inc. Securities Litigation*, 182 F.R.D. 42, 44–45 (S.D.N.Y.1998) (appointing committee of three lead plaintiffs: one state pension fund, three individuals sharing one vote as representatives of 35 others, and a mutual fund company); *In re Cendant Corp. Litigation*, 182 F.R.D. 144, 147–48 (D.N.J.1998) (appointing group of several pension fund investors based on aggregated losses); *D'Hondt v. Digi International, Inc.*, 1997 WL 405668, *3 (D.Minn. 1997) (appointing 21 lead plaintiffs and stating: "an arbitrary limit on the number of proposed Lead Plaintiffs would be unrealistic, if not wholly counterproductive").

*Inc. Securities Litigation,* 171 F.R.D. 156, 157–58 (S.D.N.Y.1997) (rejecting agreement to have two unrelated institutional investors and four individuals serve as lead plaintiffs, and appointing instead one investor with largest losses as lead plaintiff). The court in *Network Associates* concluded that a "group of persons" should be appointed lead plaintiff only if it can provide effective control of the litigation, and that aggregations of unaffiliated persons or entities whose only connection is in the litigation would not satisfy that requirement. 76 F.Supp.2d at 1026–27.

■ This court agrees that selecting as "lead plaintiff" a large group of investors who have the largest aggregate losses but who have nothing in common with one another beyond their investment is not an appropriate interpretation of the term "group" in the PSLRA. Such an interpretation rewards lawyers who solicit plaintiffs and can produce an unmanageably large group of scores, hundreds, or perhaps even thousands of "lead plaintiffs." Such groups could not effectively manage the litigation and oversee class counsel for the benefit of the class. The "subgroup" solution to that oversight problem merely acknowledges the problem while clearly evading application of the statutory standard: which person or group of persons who can effectively oversee the case "has the largest financial interest in the relief sought by the class?" Having a subgroup represent an unmanageably large group, which in turn "represents" an even larger class is not consistent with the structure and purpose of the PSLRA, and it is certainly not required by the language of the PSLRA.

In addition, appointment of such artificial groups or subgroups is likely to generate the same agency cost and collective action problems that led to enactment of the PSLRA in the first place. See *In re Telxon Corp. Securities Litigation,* 67 F.Supp.2d at 816. The incentives created by the broad interpretation of the term "group" tend to generate a great deal of truly useless activity (the premature collection of forms from investors) and controversy that adds nothing to the fair or prompt resolution of the case, or to the adequate representation of the class. In fact, some of the proposed groups of "lead plaintiffs" (like the original Sakhrani Group in this case) are themselves large enough to satisfy numerosity requirements for class actions under Rule 23(a). Nothing in the language of the PSLRA specifically requires courts to reward and encourage such enterprise with appointment of absurdly large, artificial, and unmanageable groups of "lead plaintiffs."

As the court pointed out in *In re Oxford Health Plans,* the lead plaintiff decision "must be made on a case-by-case basis, taking account of the unique circumstances of each case." 182 F.R.D. at 49; accord, *Advanced Tissue Sciences,* 184 F.R.D. at 352; *Chill v. Green Tree Financial Corp.,* 181 F.R.D. at 409. Thus, there may well be a few situations in which a small group might provide more effective oversight of class counsel than any single investor. The PSLRA gives courts the discretion to take such an approach if that seems reasonable based on the information the court has about the volunteers for lead plaintiff or perhaps because of significant differences of claims arising at different times in a longer class period. Nevertheless, this court sees no benefit in giving any weight to a mechanical aggregation of the losses of investors as a "group of persons" whose only connection is their common losing investment.[5]

5. For examples of appropriate "groups" under the PSLRA, see *In re Telxon Corp. Securities Litigation,* 67 F.Supp.2d at 823–824 (naming two brothers as lead plaintiffs); *Switzenbaum v. Orbital Sciences Corp.,* 187 F.R.D. 246, 251 (E.D.Va.1999) (appointing group of five affiliated pension funds as lead plaintiff instead of unaffiliated group of seven individuals with larger aggregate losses); *In re Milestone Scientific Securities Litigation,* 183 F.R.D. 404, 418 (D.N.J.1998) (appointing group of family members and related trusts as lead plaintiffs).

## III. *Appointment of Lead Plaintiff*

■ In some situations there might be a need for a group of unrelated lead plaintiffs, but this is not such a case. As the individual coming forward as a lead plaintiff who has suffered the largest loss, John Kilcoyne is entitled to the statutory presumption of appointment as lead plaintiff. The presumption may be rebutted with evidence that the lead plaintiff "will not fairly and adequately protect the interests of the class" or is "subject to unique defenses that render such plaintiff incapable of adequately representing the class." See 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II). No party has offered any such evidence rebutting Kilcoyne's ability to represent the class fairly and adequately.[6]

## IV. *Appointment of Lead Counsel*

■ The PSLRA gives the lead plaintiff the right to select class counsel, "subject to the approval of the court." 15 U.S.C. § 78u–4(a)(3)(B)(v). From the parties' submissions, it is clear that Kilcoyne prefers the lead counsel to be Weiss & Yourman and Stull Stull & Brody, assisted by local counsel of Kroger Gardis & Regas in Indianapolis. The court has considered the possibility of asking Kilcoyne to conduct a new, open competition to select class counsel, but rejects that option for the following reasons. First, the court is satisfied based on prior submissions that the two proposed lead firms can represent a proposed class effectively. Kroger Gardis & Regas is certainly capable of assisting them. More important, the court has been assured that these law firms have no fee agreement here. Instead, they are leaving the prospect of any future fee award up to the court. If these firms are willing to take that chance, the court sees little value in conducting a new auction.

Defendants have raised concerns about the prospect of two law firms serving as lead counsel for the class, with the possibility that more would be added. Putting aside questions of the defendants' standing to raise such objections (the court has an independent responsibility to consider such questions), the court is satisfied that the two lead firms will be reasonably efficient in sharing work, and the court's role in any later fee award provides an additional backstop. In addition, defendants' objections fail to take into account the need for class counsel to share risk. As a practical matter, any lawyer who works for the putative class in this case is making a high-risk investment. Without going into an extended discussion of principles of portfolio management and diversifying risk, it should be obvious that in some situations a lawyer taking such a large risk may prefer to share that risk with others. The prospect of court review of any fee petition should encourage a reasonable level of efficiency in allocating both work and the risks of loss and reward.

At this point, it is also appropriate to address two attacks by the Desrosiers Group on the proposed lead counsel. First, the Desrosiers Group focuses on the investor in the Sakhrani Group with the largest known losses, L.A.L.W., Inc. The court authorized a deposition of L.A.L.W., and the result has been a debacle. The Desrosiers Group issued a notice of deposition for San Diego (L.A.L.W. is based in Las Vegas, Nevada.) By agreement the deposition was rescheduled for Las Vegas. The deposition never took place because counsel for the Desrosiers Group did not

---

**6.** Counsel for the proposed Sakhrani Group estimated Dr. Levin's aggregate losses at $52,053, and counsel for the Desrosiers Group have not questioned that estimate or offered any more specific estimate of Dr. Levin's aggregate losses. The court has therefore used that estimate rather than Dr. Levin's own estimate of $55,000 (or $150 more than Kilcoyne's estimated losses), which counsel for the Desrosiers Group did not adopt or advo-

cate. Thus, Dr. Levin comes in second in the race among individuals for the largest aggregate losses. In any event, Dr. Levin's failure to comply with the court's instructions for submitting additional information about lead plaintiffs casts doubt on his potential ability to represent the class adequately, regardless of whether the failure is attributable to Dr. Levin or his lawyers.

appear at the appointed time and place. (The court record contains conflicting accounts of the reasons for this failure, one blaming it on a plane delayed by a mechanical failure and another blaming it on a minor traffic accident on the way to the airport.) The deponent and other counsel were unwilling to cool their heels for three hours waiting for Mr. Krinsk to appear. Apparently taking the view that the best defense is a good offense, counsel for the Desrosiers Group responded to the problem by filing a motion to compel seeking sanctions from the Sakhrani Group for not waiting indefinitely for him, but has more recently withdrawn that motion and instead moved simply to strike the Sakhrani Group's motion for appointment as lead plaintiffs.

The handling of the deposition alone is a good sign that the firm representing the Desrosiers Group would not provide adequate representation of the interests of this class. Nevertheless, the Desrosiers Group has pointed out accurately that the original certificate submitted on behalf of L.A.L.W. must have had an error in it because it reported a purchase of Brightpoint stock on December 27, 1998, which was a Sunday. In addition, L.A.L.W., which is a Nevada corporation, was listed by the Nevada Secretary of State as being in "default" status. An officer for L.A.L.W. has submitted an affidavit noting that the default status was the result of a failure to pay an $85 annual fee, which is apparently easy to cure. As for the error in the date of one listed purchase by L.A.L.W., the court notes that neither counsel for the Desrosiers Group nor the court has been immune from occasional typographical errors. The court does not see the error as disqualifying.

The Desrosiers Group also has submitted a flurry of paper attacking the integrity of the two proposed lead law firms for the Sakhrani Group, Weiss & Yourman and Stull Stull & Brody. These attacks are based primarily on controversies that have arisen in other securities fraud cases over attempts to package large "groups" as potential lead plaintiffs, as well as fee requests that some courts have considered excessive. The court has explained above its belief that such efforts to package large groups of lead plaintiffs are entitled to essentially no weight at all in selecting lead plaintiffs. Because some district courts have given some weight to the results of such efforts, however, it is not surprising that law firms specializing in this field of practice—especially those with the resources to produce a successful large "package"—should make the efforts. The court has reviewed the materials submitted by the Desrosiers Group and finds no convincing showing of any conduct that might serve to disqualify either of the two firms from representing the proposed class in this case. The solution to these problems should be to shift the weight of court decisions in favor of the narrow approach to the use of "groups" as lead plaintiffs under the PSLRA.

*Conclusion*

Accordingly, pursuant to the PSLRA, 15 U.S.C. § 78u–4(a)(3)(B), the court names as lead plaintiff the individual plaintiff with the largest estimated loss, John Kilcoyne, whose estimated losses during the class period are $54,850, and as lead counsel the firms of Weiss & Yourman and Stull Stull & Brody, and as local counsel the law firm of Kroger Gardis & Regas in Indianapolis. Kilcoyne shall file **no later than January 10, 2000,** an amended complaint for these consolidated actions. Defendants shall respond to the amended complaint no later than 30 days after it is filed. In light of these decisions, all pending motions in these consolidated actions are hereby denied as moot. Finally, the court orders Cause Nos. IP 99–943–C, IP 99–1138–C, and IP 99–1157–C administratively closed, and this matter will proceed as Cause No. IP 99–870–C.

So ordered.