A.F.I.K. HOLDING SPRL, Individually and On Behalf of All Others Similarly Situated, Plaintiffs,

v.

Sim FASS, Christopher G. Clement, Yehuda Sternlicht, and Bio–Technology General Corp., Defendants.

Congregation Keren Yoel Individually and On Behalf of All Others Similarly Situated, Plaintiffs,

v.

Sim Fass, Christopher G. Clement, Yehuda Sternlicht, and Bio–Technology General Corp., Defendants.

Gail West, Individually and on Behalf of All Others Similarly Situated, Plaintiffs,

v.

Christopher G. Clement, John A. Bond, Yehuda Sternlicht, Sim Fass, and Bio–Technology General Corp., Defendants.

Thomas Collins, Individually and on Behalf of All Others Similarly Situated, Plaintiffs,

v.

Bio–Technology General Corp., Sim Fass, Christopher G. Clement, John A. Bond, and Yehuda Sternlicht, Defendants.

Betty S. Wiley, Individually and on Behalf of All Others Similarly Situated, Plaintiffs,

v.

Bio–Technology General Corp., Sim Fass, John Bond, and Yehuda Sternlicht, Defendants.

Paul D. Daggett, Individually and on Behalf of All Others Similarly Situated, Plaintiffs,

v.

Christopher G. Clement, John A. Bond, Yehuda Sternlicht, Sim Fass, and Bio–Technology General Corp., Defendants.

Lilla Yorra, Individually and on Behalf of All Others Similarly Situated, Plaintiffs,

v.

Sim Fass, Christopher G. Clement, Yehuda Sternlicht, and Bio–Technology General Corp., Defendants.

Civil Action Nos. 02–6048 (HAA), 03–362 (WGB), 03–156 (HAA), 03–680 (HAA), 03–828 (JWB), 03–831 (HAA), 03–926 (HAA).

United States District Court, D. New Jersey.

Sept. 4, 2003.

J. Erik Sandstedt, Bernstein, Litowitz, Berger & Grossmann LLP, A New York Limited Liability Partnership, Westfield, NJ, for Louisiana Sheriffs' Pension and Relief Fund.

Olimpio Lee Squitieri, Newark, NJ, for the PKN Plaintiffs Group.

Joseph J. DePalma, Lite, Depalma, Greenberg & Rivas, LLC, Newark, NJ, for Anthony J. Caggiano and for the Guerra Group.

ACKERMAN, Senior District Judge.

This matter comes before the Court upon motions of the Louisiana Sheriffs' Pension and Relief Fund, ("Louisiana Sheriffs" or "LS"), Joseph Rago and Poalim Mutual Funds ("The PKN Group"), Anthony J. Caggiano ("Caggiano"), and Steven Guerra, Howard Weissberg[1], and Rebecca Detsch (collectively, "The Guerra Group"), to consolidate the captioned actions, to be appointed lead plaintiff, and for approval of the selected lead plaintiff's choice of lead counsel. For the reasons outlined below, the PKN Group's unopposed motion for consolidation is hereby GRANTED, its motion to be appointed lead plaintiff is GRANTED, its motion for approval of its choice of Glancy and Binkow and the Dekel–Sabo Law Firm to be appointed Lead Counsel is also GRANTED, and all other similar motions are correspondingly DENIED. Hereinafter, this consolidated case shall be captioned *In re Bio–Technology General Corp. Securities Litigation*, Civil Action No. 2:02cv6048.

## I. INTRODUCTION

Presently pending before this Court are six related securities class action lawsuits (the "Actions") brought on behalf of public investors who purchased the common stock of Bio–Technology General Corp. ("BTG" or the "Company") from April 19, 1999 to August 2, 2002, inclusive (the "Class Period"). The related actions allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") (15 U.S.C. § 78(j)(b) and 78(t)) and Rule 10b–5 promulgated thereunder (17 C.F.R. § 240.10b–5). BTG is a Delaware corporation with its principal place of business in Iselin, New Jersey. BTG is engaged in the research, development, manufacture, and marketing of biopharmaceutical products. Through a combination of internal research and development, acquisitions, collaborative relationships and licensing arrangements, the Company has a portfolio of therapeutic products, including nine products that have received regulatory approval for sale and are currently being marketed. Additionally, the Company has four products in registration or clinical trials and several products in pre-clinical development. The Company distributes its products through a direct sales force in the United States and through third-party license and distribution relationships in international markets. BTG is listed on the NASDAQ National Market.

The Complaint alleges that BTG and certain of its executive officers violated federal securities laws by disseminating materially false and misleading statements concerning BTG's revenue and earnings, which caused the stock price to become artificially inflated, damaging investors. Specifically, the Complaint alleges that, in order to inflate the price of the stock, Defendants caused the Company to falsely report its earnings during 1999, 2000, and 2001 through inappropriate revenue recognition practices, including recognizing revenue where significant uncertainties existed relating to realization of the invoiced amounts. On August 2, 2002 BTG announced that it would have to restate its publicly reported financial results for 1999, 2000, and 2001, thereby allegedly admitting that it violated generally accepted accounting principles ("GAAP") and that its financial statements for the period were false and

---

1. Individually and on behalf of Howard Weissberg IRA.

misleading. On October 4, 2002, BTG's outside auditors announced that they were resigning and that they believed that the Company's internal controls were deficient and needed to be significantly strengthened. As a result of these revelations, BTG's common stock dropped from a Class Period high of $20.44 per share to a low of $2.10 per share on October 7, 2002.

Plaintiff A.F.I.K. Holding SPRL ("A.F.I.K.") filed the first related action in this case (02–cv–6048) on December 20, 2002. In accordance with the statutory requirement, A.F.I.K. published a notice of pendency of its action on January 10, 2003, within 20 days of filing the action. 15 U.S.C. §§ 78u–4(a)(3)(A)(i). The notice informed class members that they may move the Court no later than March 11, 2003 to serve as Lead Plaintiff, within 60 days after publication of the notice pursuant to 15 U.S.C. §§ 78u–4(a)(3)(A) and (B). On March 11, 2003, four different individuals or entities moved this Court to consolidate the actions, to be appointed Lead Plaintiff and for this Court's approval of the selected Lead Plaintiff's choice of Lead Counsel. Those four entities or individuals are the aforementioned Louisiana Sheriffs, Caggiano, the Guerra Group, and the PKN Plaintiffs' Group. The Court is now faced with the task of appointing as lead plaintiff the member or members of the class which it determines to be most capable of adequately representing the interests of the class. 15 U.S.C. § 78u–4(a)(3)(B). This appointment process is highly regulated both by statute and by the seminal opinion in this circuit, *In re Cendant Corporation Litigation,* 264 F.3d 201 (3d Cir.2001). First, though, the Court will pause to address the issue of consolidation.

## II. CONSOLIDATION

Fed.R.Civ.P. 42(a) states that "[w]hen actions involving a common question of law or fact are pending before the court, it may ... order all the actions consolidated." *See also Nanavati v. Burdette Tomlin Memorial Hosp.,* 857 F.2d 96, 103 n. 3 (3d Cir.1988) (consolidation is appropriate where there are actions involving common questions of law or fact); *Fields v. Biomatrix, Inc.,* 198 F.R.D.

451, 454 (D.N.J.2000) (same) (citations omitted); *Liberty Lincoln Mercury, Inc. v. Ford Marketing Corp.,* 149 F.R.D. 65, 80 (D.N.J. 1993) ("Rule 42(a) gives the [d]istrict [c]ourt 'broad powers to consolidate actions involving common questions of law or fact if, in its discretion, such consolidation would facilitate the administration of justice,'" quoting *Waste Distillation Tech., Inc. v. Pan American Resources, Inc.,* 775 F.Supp. 759, 761 (D.Del.1991)). Moreover, the PSLRA directs that cases should be consolidated where there is "more than one action on behalf of a class asserting substantially the same claim or claims." 15 U.S.C. § 78u–4(a)(3)(B)(ii).

■ Neither the PSLRA nor Rule 42 requires that pending suits be identical before they can be consolidated. Rather, in deciding whether to consolidate actions under Rule 42(a), the court must balance the risk of prejudice and possible confusion against the risk of inconsistent adjudications of common factual and legal issues, the burden on the parties and witnesses, the length of time required to conclude multiple lawsuits as against a single one, and the relative expense to all concerned of the single-trial and multiple-trial alternatives. *In re Consolidated Parlodel Litig.,* 182 F.R.D. 441, 444 (D.N.J. 1998) (citations omitted); *Chill v. Green Tree Financial Corp.,* 181 F.R.D. 398, 405 (D.Minn.1998) (citations omitted); *see also Takeda v. Turbodyne Technologies, Inc.,* 67 F.Supp.2d 1129, 1133 (C.D.Ca.1999) ("[A] court must balance the savings of time and effort consolidation will produce against any inconvenience, delay, confusion, or prejudice that may result."). In the absence of an articulated basis to assert confusion or prejudice, consolidation is generally appropriate. *In re Lucent Technologies Inc. Securities Litigation,* 221 F.Supp.2d 472, 480 (D.N.J. 2001).

In the instant case, as was mentioned above, all of the related actions allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 as amended by the PSLRA. In fact, all of the actions make the same claims against the same defendant for the same actions during the same period of time. There appears to be no reason to believe that consolidation would cause incon-

venience, delay, confusion, or prejudice, nor has any objector stepped forward to articulate any basis for such a belief. As consolidation of class action securities fraud actions is generally the norm, this Court will exercise its authority under Fed.R.Civ.P. 42(a) and consolidate these actions, which henceforth shall be captioned *In re Bio–Technology General Corp. Securities Litigation.*

## III. IDENTIFYING THE MOST ADEQUATE PLAINTIFF

### 1. Rule 23 and the *Cendant* Standard

In determining the "most adequate plaintiff," the Court must adopt a presumption that:

the most adequate plaintiff in any private action arising under [the PSLRA] is the person or group of persons that:

(aa) has either filed the complaint or made a motion in response to a notice....

(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u–4(a)(3)(B)(iii).

Other parties may rebut this presumption "only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—(aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *Id.* § 78u–4(a)(3)(B)(iii)(II).

The Third Circuit has described the draftsmanship of this section as "inartful and hence problematic." *See generally, Cendant,* 264 F.3d at 263–265 (discussing overall structure and legislative history of the statute to reconcile an ambiguity that makes the typicality and adequacy requirements of Rule 23 both part of the threshold identification of the presumptive lead plaintiff and the sole means of rebutting the lead plaintiff presumption). Thus, the Third Circuit refined the lead plaintiff selection and rebuttal process and established a standard procedure.

■ First, a court must determine whether the movant with the largest financial interest in the case has made a *prima facie* showing of typicality and adequacy so that it "otherwise satisfies" Rule 23. *Id.* at 263. This determination should be a product of the court's independent judgment. *Id.* The court may and should consider the pleadings that have been filed, the movant's application, and any other information that the court requires to be submitted. *Id.* at 264. Once a *prima facie* showing has been made, it is a rebuttable presumption that this movant will serve as the lead plaintiff. *Id.* Arguments by members of the purported plaintiff class as to why the movant with the largest financial losses does not otherwise satisfy Rule 23 should be considered only in the context of assessing whether the presumption has been rebutted, and not by the court during the initial, *prima facie* inquiry. *Id.* at 263–64. In making the *prima facie* determination of typicality, the court should apply traditional Rule 23 principles, specifically, whether the circumstances of the movant with the largest losses "are markedly different or the legal theory upon which the claims [of that movant] are based differ[ ] from that upon which the claims of the other class members will perforce be based." *Id.* at 265, (quoting *Hassine v. Jeffes,* 846 F.2d 169, 177 (3d Cir.1988)); *see also Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 631 (3d Cir. 1996). Likewise, in making the *prima facie* determination of adequacy a court should consider whether the movant "has the ability and incentive to represent the claims of the class vigorously, [whether it] has obtained adequate counsel, and [whether] there is [a] conflict between [the movant's] claims and those asserted on behalf of the class." *Id.,* (quoting *Hassine,* 846 F.2d at 179); *see also Georgine,* 83 F.3d at 630 (stating that the adequacy of representation inquiry involves consideration of both whether "the interests of the named plaintiffs [are] sufficiently aligned with those of the absentees" and whether "class counsel [is] qualified and [will] serve the interests of the *entire* class"). (Emphasis supplied).

■ Furthermore, in making the initial adequacy assessment, courts should consider

two additional factors. The court should inquire whether the movant has demonstrated a willingness and ability to select competent class counsel and to negotiate a reasonable agreement with that counsel. *Id.* at 265. If the movant with the largest financial losses lacks legal experience or sophistication, or selects lead counsel plainly incapable of undertaking the representation, or if it negotiates a clearly unreasonable fee agreement with its chosen counsel, the court might conclude that the movant had failed to surmount the threshold adequacy inquiry. *Id.* Again, the question at this *prima facie* stage is not whether the court would approve that movant's choice of counsel, or the terms of its retainer agreement, or whether another movant may have chosen better lawyers or negotiated a better fee agreement. Instead, the relevant question is "whether the choices made by the movant with the largest losses are so deficient as to demonstrate that it will not fairly and adequately represent the interests of the class, thus disqualifying it from serving as lead plaintiff at all." *Id.* at 266.

 Another factor in making the threshold adequacy determination arises only when the movant with the largest financial interest in the relief sought by the class is a group rather than an individual person or entity. A "group of persons" is explicitly allowed to serve as lead plaintiff. 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). This group of persons need not be related in some manner. *Cendant,* 264 F.3d at 266. Courts should generally presume, however, that groups with more than five members are too large to work effectively. *Id.* at 267.

 Should the court determine that the movant with the largest losses cannot make a threshold showing of typicality or adequacy, then the court should explain its reasoning on the record and disqualify that movant from serving as lead plaintiff. *Id.* The court should then identify the movant with the next largest loss, consider whether the movant satisfies the Rule 23 requirements, and repeat this process until the presumptive lead plaintiff is identified. *Id.*

Once the presumptive lead plaintiff has been identified, the court should turn to the question of whether or not any of the other movants have rebutted the presumption. *Id.* at 268. Only class members may seek to rebut the presumption, thereby excluding arguments from defendants and non-class members. *Id.* Once the presumption has been established, the question is not whether another movant might do a better job of protecting the interests of the class than the presumptive lead plaintiff. Rather, the question is whether anyone can prove that the presumptive lead plaintiff will not do a "fair[ ] and adequate [ ]" job. *Id.* If no class member succeeds in rebutting the presumption, the court should appoint the presumptive lead plaintiff as lead plaintiff. If the presumption has been rebutted, however, the court must begin the process anew until a lead plaintiff is selected. *Id.*

### 2. Applying the Standards

The Guerra group filed the complaint in this matter, whereas the PKN group, Caggiano, and Louisiana Sheriffs' all filed their motions in response to notice. Consequently, all four movants meet prong (aa) of the most adequate plaintiff test. The PKN group's total losses are represented to be $797,070.68, followed by Caggiano's losses of approximately $205,355, Louisiana Sheriff's losses of $189,600, and the Guerra group's losses of $53,965.62. Accordingly, the PKN group has the largest financial stake in the relief sought by the class, thereby surpassing the other movants on prong (bb). The question remains, therefore, whether the PKN group "(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u–4(a)(3)(B)(iii).

 To answer this question the Court must follow the Third Circuit's directive to look to whether the movant with the largest stake in the outcome has made a *prima facie* showing of typicality and adequacy. The PKN group, like all members of the class, alleges that defendants violated the Exchange Act by publicly disseminating a series of false and misleading statements concerning BTG's financial condition. (PKN Memorandum of Law, Mar. 11, 2003 at 8–9). Accordingly, the circumstances of the PKN

group are not markedly different from those of other class members. Moreover, the PKN group purchased BTG stock during the Class Period at prices allegedly inflated by the misleading statements, and therefore PKN seeks recovery under the same legal theory as other members of the class, for injuries caused by the same alleged acts. Thus, the PKN group has made a *prima facie* showing that it is typical of the class.

The PKN group must also be an adequate representative of the class. The PKN group is composed of an individual named Joseph Rago, and Poalim Mutual Funds, Ltd. Poalim Mutual Funds is an Israeli mutual fund management company subject to Israel's Joint Investment Trust Law, 5754–1994. (*See* Decl. of Jacob Sabo, Ex. A, April 10, 2003 at 1.) Established in 1962, Poalim Mutual Funds manages 36 mutual funds with combined assets under management of approximately $1.37 billion as of March 31, 2003. (*See* Decl. of Eldad Malkin, Managing Director, Poalim Mutual Funds, Ltd., ¶ 3.) Mr. Malkin has submitted an affidavit stating that Poalim Mutual Funds "understands that the captioned case comprises complex litigation and stands ready, willing, and able to represent the class in this action." *Id.*, ¶ 8.[2]

As the class member with the largest loss, the PKN Group has at least as much incentive as the other class members to pursue a recovery vigorously. Moreover, the fact that Poalim Mutual Funds is an institutional investor accords with one of the policy objectives of the PSLRA, namely, that institutional investors serve as lead plaintiffs. *Cendant*, 264 F.3d at 276 ("Both the Conference Committee Report and the Senate Report state that the purpose of the [PSLRA] was to encourage institutional investors to serve as lead plaintiff, predicting that their involvement would significantly benefit absent class members.") *See also* House Conference Report No. 104–369, Cong. 1st Sess. at 34 (1995), U.S.Code Cong. & Admin.News

1995, pp. 730, 733 ("The Conference Committee seeks to increase the likelihood that institutional investors will serve as lead plaintiffs by requiring that courts presume that the member of the purported class with the largest financial stake in the relief is the 'most adequate plaintiff.' ")

Additionally, the PKN group appears to have selected adequate counsel. The group proposes that Glancy & Binkow LLP and Dekel–Sabo serve as co-lead counsel. Glancy & Binkow, a Los Angeles firm with an office in New York, New York, specializes in securities fraud, antitrust, and complex commercial litigation, and is presently serving as lead counsel or co-lead counsel in at least a dozen class action securities fraud litigations throughout the Untied States. (*See* Decl. of Lee Squitieri, March 11, 2003, Ex. D.) Likewise, the Dekel–Sabo firm, based in Tel Aviv, Israel, specializes in commercial and corporate law.[3] *Id.* The PKN Group's choice of lead counsel appears to be competent, and is certainly not plainly incapable of undertaking the representation. Furthermore, this Court has conducted an *in camera* review of the agreement reached between the Glancy and Binkow firm and Poalim Mutual Funds, as well as the agreement reached between Glancy and Binkow and Joseph Rago, and cannot conclude that these agreements are "clearly unreasonable."[4] Accordingly, the group's choice cannot be said to be so deficient as to demonstrate that it will not fairly and adequately represent the interests of the class.

Finally, the PKN group is comprised of more than one entity, encompassing both the PKN Biotechnology Fund as well as an individual named Joseph Rago. Since a group of persons is explicitly permitted to serve as lead plaintiff, and since the PKN group consists of only two such persons, the presumption that groups with more than five members is too large to work effectively is inapplicable here.

---

2. Mr. Rago, the other party comprising the PKN group, has submitted an affidavit attesting to the same. (*See* Decl. of Joseph Rago, ¶ 1.)

3. Pursuant to Local Civil Rule 101.1(c), this Court will only hear from attorneys who are members in good standing of the bar of any court of the United States or of the highest court of any

state. Such attorneys may apply on motion for admission *pro hac vice*.

4. This Court will treat the agreements between the lead plaintiffs and Glancy and Binkow as binding upon the Dekel–Sabo firm.

Accordingly, the Court finds that the PKN Group has made a *prima facie* showing that it is presumptively the most adequate lead plaintiff. The Court now turns to the question of whether any of the other movants have successfully rebutted that presumption.

## IV. REBUTTING THE PRESUMPTION

■ The Defendant Bio–Technology General Corporation's own filing with the SEC discloses that Bank Hapoalim, the "grandparent" company of Poalim Mutual Funds[5], is BTG's sole lender and that it has a loan outstanding to a wholly owned subsidiary of BTG of almost $20 million. Objectors Louisiana Sheriffs' and Caggiano argue that this fact alone rebuts the presumption the PKN Group is the most adequate plaintiff, as it makes Poalim Mutual Funds neither a typical member of the class nor an adequate class representative pursuant to Rule 23. Specifically, the objectors argue that the $20 million loan creates a conflict of interest between the Poalim Mutual Funds and the remaining class members, because Poalim Mutual Funds' grandparent company Bank Hapoalim ultimately has a greater incentive of ensuring that its $20 million loan is repaid than in Poalim Mutual Funds' recovery of its $650,000 worth of losses during the Class Period. The objectors argue that there are serious questions about the financial viability of BTG as well as its liquidity: as of its latest submission, LS represents that BTG's stock was trading at $3 per share, that BTG will have to restate its financial statements for the last three years, and that BTG's prior auditor, KPMG LLP, resigned because it believed that BTG's financial reporting procedures were significantly deficient (Louisiana Sheriffs' Memorandum in Further Supp. and In Opp'n to Competing Motions, March 31, 2003 at 8.) As of September 30, 2002, BTG had only $15 million in cash, compared to $75 million as of December 31, 2001. Louisiana Sheriffs' represents that damages pursuant to the securities claim could "very well exceed $100 million." *Id.* Of further concern is that the $20 million loan is secured by the

Company's assets. (*See* Ex. D, BTG's Form 10 Q at 23.) The concern is that if there are insufficient funds for BTG to satisfy both the $20 million loan and the securities claim, the PKN Group would have the first rights to sell off the assets and potentially leave the class with no recovery.

Not surprisingly, the PKN Group disputes this account of BTG's financial status, pointing out that the Company is a viable corporation with reported net income of $9.71 million for its most recent financial reporting year, total debt of $19.7 million and an enterprise value of approximately $202 million. (PKN Group Reply Memorandum at 11.) PKN further points out, correctly, that LS's damage estimate of over $100 million is purely speculative, as LS admits it has undertaken no damage assessment at this point. Moreover, PKN observes that pushing the company into bankruptcy would likely injure all shareholders and that in several recent high profile cases plaintiffs have agreed to settlements short of pushing the defendant into bankruptcy for fear of harming themselves as much as the defendant. (*See* PKN Reply Memo, Ex. A., "Lucent Holders May Get Little In Settlement, Wall Street Journal, April 7, 2003.")

The PKN Group also asserts that the objectors' concerns are based on a number of unanalyzed assumptions. First and foremost is the assumption that Poalim Mutual Funds will ultimately act in the best interests of its grandparent company rather than in its own best interests. While the PKN group acknowledges that Poalim Mutual Funds's grandparent is Bank Hapoalim, it points out that Poalim Mutual Funds and Bank Hapoalim are two distinct companies with two distinct boards of directors. (Sabo Decl. In Support of PKN Plaintiff Group's Reply In Supp. of Motion For Appointment As Lead Plaintiff And For Approval Of Its Selection Of Lead Counsel ("Sabo Decl."), ¶¶ 9, 10, 11.) Moreover, the PKN Group asserts that Poalim Mutual Funds is precluded by Israeli law from compromising the interests of its inves-

---

**5.** Bank Hapoalim is the parent company of Poalim Financial Holdings, which is in turn the parent company of Poalim Mutual Funds, one of the two entities comprising the PKN Lead Plaintiff Group. In the interest of both simplicity and accuracy, the Court refers to Bank Hapoalim as the "grandparent" company of Poalim Mutual Funds.

tors. (Sabo Decl. ¶¶ 5, 6.) Further, Poalim Mutual Funds asserts that it makes its investment decisions independent of Bank Hapoalim. (Malkin Decl., ¶ 5). Therefore, the PKN Group asserts, the conflict of interest claim is overstated.

While these representations are somewhat helpful to the Court, they do not alleviate the sense that a nascent conflict of interest exists here. The question, though, is whether this nascent conflict of interest is strong enough to rebut the presumption that the PKN Plaintiffs Group is the most adequate lead plaintiff. The Court resolves this issue by reference, again, to the seminal case in this circuit. In *Cendant*, the Third Circuit was faced with a similar issue. The lead plaintiff in that case continued to hold "huge amounts" of Cendant stock during the settlement negotiations. *Cendant*, 264 F.3d at 243. On appeal, one of the members of the class argued that the lead plaintiff had been subject to a conflict of interest on account of its ongoing investments in Cendant, and that this conflict rendered it inadequate for purposes of representing the class. Specifically, the objector argued that the lead plaintiff was clearly conflicted between trying to get maximum recovery for the class and trying to protect its ongoing investment in the corporation, e.g. by settling cheap or by securing corporate governance changes in lieu of cash, an argument which mirrors the conflict alleged in the current case at bar. *Id.* While acknowledging that this thesis was "attractive," the Third Circuit rejected it, holding that Congress itself had rejected this reasoning in crafting the PSLRA. By pointing out that the PSLRA's legislative history expressly states that Congress anticipated and intended that institutional investors would serve as lead plaintiffs, and by presuming that Congress was aware that an institutional investor with enormous stakes in a company was very unlikely to divest itself of all its holdings in the company even after an alleged securities fraud, the Circuit Court concluded that "Congress must have thought that the situation created here *does not inherently create an unacceptable conflict of interest*." *Id.* at 244 (emphasis added).

The question, then, is whether this argument can be extended to encompass parent or even grandparent companies who do not necessarily own stock in the defendant company, but nevertheless have a strong financial stake in that company's future. This Court believes that it can. If Poalim Mutual Funds itself had extended the loan directly to BTG, this Court would have to conclude, under *Cendant*, that such a loan would not inherently create an unacceptable conflict of interest. The fact that the loan was extended by the grandparent company further attenuates the conflict. This is not to suggest that there is no conceivable conflict of interest that could disqualify a potential lead plaintiff. But this Court interprets *Cendant* to stand for the proposition that the lead plaintiff's continued financial stake in the defendant is not in and of itself sufficient to raise an unacceptable and disqualifying conflict of interest. Objectors must come forward with something more. It is true that Poalim Mutual Funds has made what can be best described as a modest effort to demonstrate its independence from Bank Hapoalim. For example, Eldad Malkin, the Managing Director of Poalim Mutual Funds who signed the certification, is listed as a member of the board of directors of Polaim Mutual Funds' parent Poalim Financial Holdings. It is also true that the more independent Poalim Mutual Funds is from Bank Hapoalim, the better this Court feels it will represent the class. But in the final analysis, Poalim Mutual Funds' independence from its parent and grandparent companies is not really relevant under *Cendant*. The relevant issue is whether it (and Joseph Rago) suffered the largest financial loss for the same allegedly improper actions that injured the rest of the class.

Louisiana Sheriffs' points out that the lead plaintiff's grandparent would stand ahead of the rest of the class should BTG be forced into bankruptcy. This fact, however, would remain true regardless of the identity of the lead plaintiff. Moreover, that fact alone does not lead to the conclusion that Poalim Mutual Funds would be less zealous in pursuing a full recovery. In short, the loan itself is not sufficient enough reason to rebut the presumption.

■ A second concern raised by the objectors is that Bank Hapoalim—and by extension, the PKN Group—may have had direct dealings with BTG, including access to BTG's financial information that was not available to the other members of the class. If this is the case, the objectors argue, it could subject the PKN Group to the unique defense that it relied on direct representations made by the Company when it purchased BTG's securities. The class's theory of reliance would presumably be based on the fraud on the market theory, namely, that the price of the stock incorporated all publicly available information on BTG, and to the extent this information was false and misleading the price of the stock was artificially inflated and investors were defrauded. Therefore, PKN's theory of reliance could differ from the rest of the class's theory, namely, that it relied on direct representations from the defendant. Accordingly, the objectors argue, the PKN Group does not "otherwise satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(cc). In support of this position, the objectors cite two pre-PSLRA cases, *Landry v. Price Waterhouse Chartered Accountants*, 123 F.R.D. 474, 476 (S.D.N.Y. 1989) and *Gary Plastic Packaging Corp., v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir.1990), two cases which refused to certify a class where its putative representative was subject to unique defenses.

Typically, courts will find a disqualifying unique defense where the potential named plaintiff has had a direct or personal relationship with a board member or officer of the issuing company. *In re Independent Energy Holdings PLC Securities Litig.*, 210 F.R.D. 476, 481 (S.D.N.Y.2002). However, courts rarely find such disqualifying defenses in the absence of evidence that the named plaintiff received non-public information from a corporate officer. *Id.* Thus, in several cases where the lead plaintiff had direct and personal contacts with an officer of the defendant, no disqualifying unique defense was found since no evidence was presented that the lead plaintiff had been privy to non-public information and there was no indication in the record that the lead plaintiff had

purchased its shares in reliance upon anything other than public information. *See id.; see also Dietrich v. Bauer*, 192 F.R.D. 119, 125 (S.D.N.Y.2000), *Hallet v. Li & Fung, Ltd.*, No. 95 Civ. 8917, 1997 WL 621111, at *3 (S.D.N.Y. Oct.6, 1997), *Cosmas v. DelGiorno*, No. CV–94–1974, 1995 WL 62598, at *3 (E.D.N.Y. Feb.8, 1995).

Here, the objectors have presented no evidence of direct contact between the presumed lead plaintiff and any of the defendant's corporate officers. Certainly there is no evidence in the record that suggests the PKN Plaintiffs Group relied on non-public information in deciding to invest in BTG. Consequently, this Court cannot disqualify the PKN Group on the basis that it is subject to unique defenses.

LS, The Guerra Group, and Caggiano have all pointed out that The PKN Group was late in filing some of its submissions with this Court. Specifically, the PKN Group was late in submitting its reply memorandum. The PKN Group has acknowledged its error and apologized to the Court for the inconvenience. Obviously, this Court expects that going forward, the PKN Group will file its papers punctually. The Court has excused the late filing and finds that this is insufficient grounds to rebut the presumption that PKN is the most adequate lead plaintiff.

As a final matter, the objectors argue that the PKN Group is an improper aggregation of parties. Specifically, the objectors argue that the PKN Group has not submitted any evidence that its constituent members, Poalim Mutual Funds and Joseph Rago, had a preexisting relationship other than the mere fact that they both invested in BTG and are represented by the same counsel. (LS Memorandum in Further Supp. at 12). In the Third Circuit, no such preexisting relationship is necessary. *See* supra at 11. LS simply ignores this fact, citing cases in support of this proposition that are either from outside this Circuit or are clearly distinguishable. *See, e.g., Smith v. Suprema Specialties, Inc.*, 206 F.Supp.2d 627, 635 (D.N.J. 2002) (finding improper aggregation of twenty-two unrelated parties); *Sakhrani v. Brightpoint, Inc.*, 78 F.Supp.2d 845 (S.D.Ind.

1999) (outside the Third Circuit). Accordingly, there is nothing improper about the aggregation of Rago and Poalim Mutual Funds into the PKN Group.

## V. CONCLUSION

For the aforementioned reasons, this Court will consolidate the various actions before it, and appoint The PKN Group as lead plaintiff, Glancy and Binkow and the Dekel–Sabo Law Firm as lead counsel.

