### In re: RAZORFISH, INC. SECURITIES LITIGATION

**This matter relates to: All Actions**

**No. 00 CV 9474 JSR.**

United States District Court, S.D. New York.

May 4, 2001.

---

Steven G. Schulman, Peter E. Seidman, Samuel H. Rudman, Milberg, Weiss, Bershad, Hynes & Lerach, L.L.P., New York City, Neil Rothstein, Scott & Scott, Colchester, CT, Mel E. Lifshitz, Bernstein,

Liebhard & Lifshitz, L.L.P., New York City, Peter D. Bull, Bull & Lifshitz, L.L.P., New York City, Jules Brody, Stull, Stull & Brody, New York City, Curtis V. Trinko, Law Offices of Curtis V. Trinko, LLP, New York City, for Plaintiff.

## OPINION

RAKOFF, District Judge.

These 13 consolidated securities fraud actions allege—in complaints transparently copied from one another [1]—that defendant Razorfish, Inc. and several of its officers and former officers made false and misleading statements concerning the company's operations that artificially inflated the price of its stock over the period February 15, 2000 through October 5, 2000. After the complaints were filed and timely notice given to the putative class, three competing motions were brought under the relevant provision of the Private Securities Litigation Reform Act of 1995 ("the Reform Act"), 15 U.S.C. § 78u–4(a)(3), seeking to have the respective movant(s) appointed as lead plaintiff, and their respective counsel appointed as lead counsel, to conduct the consolidated class litigation.

In one such motion, the law firm of Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein") moved for the appointment as lead plaintiff of Beth Cowan Pressel, an individual shareholder whose loss as a result of the alleged fraud was originally estimated at $4.9 million. The motion also sought the appointment of Wolf Haldenstein as lead counsel. In a second motion, the law firms of Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss"), Schiffrin & Barroway LLP, Bernstein Liebhard & Lifshitz LLP,

Scott & Scott LLC, and Cohen, Milstein, Hausfeld & Toll PLC moved for the appointment as lead plaintiff of a group of investors they termed the "Azimut Group," consisting of a large financial institution, Fahnestock Asset Management ("Fahnestock"), with an estimated loss of $2.6 million, two smaller "day-trading" companies, Azimut SGR and Bridgeport DPM, with estimated losses of $1.1 million and $1.9 million respectively, and an individual investor, Deborah Root, with an estimated loss of $700,000. The motion also sought the appointment of three firms—Milberg Weiss, Schiffrin & Barroway, and Bernstein Liebhard & Lifshitz—as lead counsel, with the remaining two firms, Scott & Scott and Cohen, Milstein, Hausfeld & Toll, to serve on the "Executive Committee." Finally, in the third motion, the law firm of Beatie & Osborn LLP moved for the appointment as lead plaintiff of an individual investor, Dominick Pigno, whose estimated loss was something under $40,000. This motion further argued that regardless of who was selected as lead plaintiff, lead counsel should be selected by means of an auction.

Following briefing and oral argument, the Court declined to grant any of the motions in the form submitted but instead designated Fahnestock as lead plaintiff and its two counsel, Milberg Weiss and Schiffrin & Barroway, as lead counsel. *See* Order, February 22, 2001. This Opinion sets forth the reasons for that Order.

A frequent accompaniment to the use of the securities class action device is lawyer-driven litigation, by which counsel for the putative class seek to realize substantial recoveries for themselves. Prior to the Re-

---

1. The original complaint, drafted by the law firm of Milberg Weiss Bershad Hynes & Lerach LLP on behalf of plaintiff Andrew J. Powers, was filed on December 13, 2000. Within days, numerous other complaints were filed that copied the original complaint essentially verbatim. One can only wonder whether the edicts of Rule 11, Fed.R.Civ.P., were followed in the investigation and drafting of these copycat complaints.

form Act, the courts were obliged to scrutinize class counsel's fees, as best they could, at the end of the case, when, typically, the case had settled and no party was challenging the fees. In such circumstances, all parties, including the Court, had a vested interest in not "rocking the boat," and the evaluation of counsel's fees was often superficial. *See In re Continental Illinois Sec. Litig.,* 962 F.2d 566, 572–73 (7th Cir.1992). As a result, plaintiffs' counsel sometimes reaped excessive fees at the expense of their own clients.

To try to remedy this and related problems, Congress, as part of the Reform Act, provided that the Court would appoint as lead plaintiff the "most adequate plaintiff," which was presumed (rebuttably) to be:

> the person or group of persons that— (aa) has either filed a complaint or made a motion in response to [the initial class] notice...; (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u–4(a)(3)(B). Once selected, the most adequate plaintiff would, "subject to the approval of the court, select and retain counsel to represent the class." *Id.* The theory of these provisions was that if an investor with a large financial stake in the litigation was made lead plaintiff, such a plaintiff—frequently a large institution or otherwise sophisticated investor—would be motivated to act like a "real" client, carefully choosing counsel and monitoring counsel's performance to make sure that adequate representation was delivered at a reasonable price. *See, e.g.,* Elliott J. Weiss & John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions,* 104 Yale L.J. 2053, 2089 (1995).

As the instant case illustrates, however, securities class litigation continues to be lawyer-driven in material respects and the reforms Congress contemplated in the Reform Act can be achieved, if at all, only with some help from the courts. Here, as in many other such cases, most of the counsel who filed the original complaints attempted before filing the instant motions to reach a private agreement as to who would be put forth as lead plaintiff and lead counsel and how fees would be divided among all such counsel. *See* transcript of hearing on these motions on February 21, 2001 ("Tr."), at 11–12. The result—presented as an attempt to avoid wasting judicial resources, *see, e.g.,* Tr. 11, 13, but arguably also motivated by a desire to obtain oligopolistic profits, *see* Tr. 12, 16—was the proffer of a makeshift "lead plaintiff," the "Azimut Group," consisting of unrelated entities having no prior contact with each other and little or no prior contact with their counsel, *see, e.g.,* Tr. 7–14.

The only reason this attempt at presenting a "package deal" fell through, according to the Wolf Haldenstein partner representing Ms. Pressel, was that "when Ms. Pressel [belatedly] contacted my firm and we became aware of the magnitude of her losses, we called the Milberg Weiss firm to tell them that we had a very large plaintiff and to see if there was any interest in putting together a group with us [but we] were told that it was really too late in the day." Tr. 19. Further still, a third law firm, Beatie & Osborn, not party to the proposed arrangement and representing a client with a relatively small stake, nonetheless entered the fray by moving to have lead counsel selected on the basis of whichever firm would take on the matter most cheaply (which it doubtless believed would be it).

None of this mild competition was, however, client driven. On the contrary, coun-

sel for the various movants essentially conceded at oral argument that they had had only modest communication with their respective clients before bringing the instant motions, *see, e.g.,* Tr. 8–10, with frequently negative consequences.

■ For example, even though Wolf Haldenstein, as counsel for moving plaintiff Beth Cowan Pressel, initially represented that her loss from the fraud alleged in the class complaint was $4.9 million, by the time of oral argument counsel had reduced the estimate of the putative loss to $3.9 million and admitted some doubt as to the accuracy of even this reduced figure. *See* Tr. 28. Furthermore, it emerged that Ms. Pressel acquired her shares of Razorfish not through an ordinary purchase but pursuant to a court order ancillary to her divorce from one of the founders of a company, i-Cube, the extent of whose "integration" into Razorfish is the central disputed issue in this case. *See* Consolidated and Amended Complaint ¶¶ 24–53. In such circumstances, Ms. Pressel cannot possibly merit appointment as lead plaintiff, since she neither meets the typicality and other requirements of Rule 23, Fed. R.Civ.P., nor is free from being confronted with defenses unique to her—including a challenge to her standing, *see* Tr. 24–26—that may well compromise her representation of the class. *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(cc) and (II)(bb).

The tenuous connection and inadequate communication between counsel and client also infects, in a different way, the motion brought by the collection of counsel purporting to represent what they term the "Azimut Group," an *ad hoc* combination of a large financial institution, two smaller "day-trading" companies, and an individual investor, that have no prior connection with each other or with each other's counsel.

■ To be sure, the Reform Act does not require that the lead plaintiff be a single person or entity. *See, e.g., Weltz v. Lee,* 199 F.R.D. 129, 132–33 (S.D.N.Y. 2001); *In re Oxford Health Plans, Inc. Sec. Litig.,* 182 F.R.D. 42, 45 (S.D.N.Y. 1998). On the contrary, the Act directs the Court to "appoint as lead plaintiff the member *or members* of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members," 15 U.S.C. § 78u–4(a)(3)(B)(i) (emphasis added), and further provides that "the court shall adopt a presumption that the most adequate plaintiff ... is the person *or group of persons* that ... [*inter alia*] in the determination of the court, has the largest financial interest in the relief sought by the class...." § 78u–4(a)(3)(B)(iii)(I) (emphasis added).

■ But this language necessarily must be construed in light of the language and purpose of the Reform Act as a whole, which, as noted, contemplates that client-driven litigation will replace lawyer-driven litigation. *See, e.g., Aronson v. McKesson HBOC, Inc.,* 79 F.Supp.2d 1146, 1152–54 (N.D.Cal.1999); *In re Telxon Corp. Sec. Litig.,* 67 F.Supp.2d 803, 815 (N.D.Ohio 1999); *In re Donnkenny Inc. Sec. Litigation,* 171 F.R.D. 156, 157–58 (S.D.N.Y. 1997). The "Azimut Group" is simply an artifice cobbled together by cooperating counsel for the obvious purpose of creating a large enough grouping of investors to qualify as "lead plaintiff," which can then select the equally artificial grouping of counsel as "lead counsel" and its "executive committee." As Judge Cedarbaum stated in *Donnkenny, supra:*

> To allow an aggregation of unrelated plaintiffs to serve as lead plaintiffs defeats the purpose of choosing a lead plaintiff. One of the principal legislative purposes of the [Reform Act] was to

prevent lawyer-driven litigation. Appointing lead plaintiff on the basis of financial interest, rather than on a "first come, first serve" basis, was intended to ensure that institutional plaintiffs with expertise in the securities market and real financial interests in the integrity of the market would control the litigation, not lawyers. *See* H.R. Conf. Rep. No. 104–369, at 31–35 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 730, 730–34. To allow lawyers to designate unrelated plaintiffs as a "group" and aggregate their financial stakes would allow and encourage lawyers to direct the litigation. Congress hoped that the lead plaintiff would seek the lawyers, rather than having the lawyers seek the lead plaintiff. *Id.* at 35.

*Donnkenny, supra,* at 157–58.

Given, moreover, that the Azimut Group has no independent existence and its composite members have no prior relationship, there is nothing to suggest that they will collectively ride herd on counsel anywhere as well as could a single sophisticated entity. As the Court noted in *Telxon, supra:*

> The larger the group, the less incentive any single member of the group—and certainly the group as a whole—will have to exercise any supervision or control over the litigation.... This is especially so if the group consists of not only a larger number of persons, but also of persons who bear no relation and have no connection with one another beyond the fact that they suffered financial loss as a result of a drop in the price of their shares of stock. Without some cohesiveness within the group, or something to bind them together as a unit, there is no reason for the individual members of the group to speak and act with a uniform purpose...and, because there is no reason for the individual members to act collectively (no structure for decision

making, etc), the group as a whole will not engage in monitoring. Thus, the problem sought to be remedied by the [Reform Act]'s lead plaintiff provisions would remain unaddressed.

*Telxon, supra,* at 815–16.

Furthermore, the suggestion of counsel for the Azimut Group that there is some benefit to having a "lead plaintiff" that is composed of different kinds of entities and individuals, *see, e.g.,* Tr. 14, seems misplaced in a case that is premised on a "fraud on the market" theory equally applicable to virtually all investors (except those, such as Ms. Pressel, as to whom there are unique defenses). Conversely, if the differences between the various kinds of investors here involved make a material difference, the only proper solution is the creation of separate classes, each with its own lead counsel, rather than a single class led by a disparate group of investors. *See Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 622–25, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

In short, under any analysis, the "Azimut Group" does not merit appointment as lead plaintiff.

Turning to the third movant, Dominick Pigno: his counsel, at oral argument, graphically described how the counsel who dominate the securities plaintiffs' bar have developed practices that effectively undercut the goals and purposes of the Reform Act:

> People run to the courthouse. They file a complaint. They then publish their notice, which we're allowed to do under the act, that says our firm has filed a lawsuit, if you're interested in joining, please call us. The minions at the firms then stand by the fax machines and the computers waiting for an inquiry from somebody with a large loss, and when that comes across the wire they jump up and down, they run to the partner, and

they say we've got somebody with seven hundred thousand, they look like an institution, they might be an institution, you know, we've got—somebody else over here has five hundred thousand. So you then have people that think—you have law firms that think we've got a good plaintiff, and we may get control of this case. Then what happens is since everybody knows who the other players are in the game, the firms start to call one another, and then you have a game of chicken, because you have firms that say well, I've got seven hundred thousand, so I think I could beat you because you only have six hundred thousand, and the guy with six hundred says yeah, but I'm gonna go in with Firm C that has five hundred, that's going to give us a million one, so we're gonna beat your seven. And then the guy says well, but aggregation, maybe the judge won't like aggregation, so why don't we just all get together.

And you heard Mr. Barroway acknowledge that's really how it works. This is for the lawyers. It's not for the class.

Tr. 38–39.

■ To counter these practices and maximize recovery for the class rather than counsel, Pigno's counsel urges the Court to follow those courts that have devised an auction system, whereby sealed bids for attorneys' fees arrangements are submitted by competing law firms and the lowest qualified bidder is designated lead counsel. *See, e.g., In re Lucent Tech., Inc. Sec. Litig.,* 194 F.R.D. 137, 156–57 (D.N.J. 2000); *Sherleigh Assocs. LLC v. Windmere–Durable Holdings, Inc.,* 184 F.R.D. 688, 692 (S.D.Fla.1999); *In re Cendant Corp. Litig.,* 182 F.R.D. 144, 151 (D.N.J. 1998). But whatever the abstract merits or demerits of this suggestion, *see, e.g.,* Andrew K. Niebler, *In Search of Bargained–For Fees for Class Action Plaintiffs' Lawyers: The Promise and Pitfalls of Auctioning the Position of Lead Counsel,* 54 Bus. Law. 763 (1999), it is not, in this Court's view, remotely consistent with the Reform Act, which seeks to achieve these results through the very different approach of close client supervision.

■ To this end, the statute, as noted, provides, *inter alia,* that the presumptive lead plaintiff is the plaintiff with the biggest stake in the litigation, who then selects lead counsel. Under the approach urged by Pigno's counsel, by contrast, the presumptive lead counsel is the cheapest lawyer, who is then more or less forced upon the largely irrelevant lead plaintiff.

Here, Pigno himself has a stake in the litigation far more modest than either of the other movants and bears no relationship whatever to the kind of client Congress had in mind as lead plaintiff. *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(bb); H. Conf. R. 104–369, *reprinted in* 1995 U.S.C.C.A.N. 730, 733–34. If selected as lead plaintiff, his modest stake is unlikely to provide the kind of incentive for close supervision of counsel that the Reform Act contemplates, let alone an incentive to strongly negotiate counsel's fees.

But, of course, under the auction approach, Pigno himself is an irrelevancy, and his counsel is quite content, if it wins the auction, to represent anyone, even a total stranger, whom the Court designates as lead plaintiff. Yet the statute prescribes that "the most adequate plaintiff shall, subject to the approval of the court, select and retain counsel." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)(v). By no reasonable reading of this language can the Court's right to disapprove lead plaintiff's choice of counsel be transmogrified into a right to arrange a shot-gun marriage between strangers.

This is not to say that an economic component cannot enter into the Court's decision of whether or not to approve lead plaintiff's choice of counsel, since an excessive compensation proposal can cast in doubt the ability of proposed lead counsel to adequately represent the class. In this very case, the Court required that proposed counsel for each of the putative lead plaintiffs submit to the Court, under seal, its proposed fee arrangements for representing the class. Where, upon review of these submissions, it became clear to the Court that the proposal by one of the counsel, while within conventional limits, was excessive both in terms of the other submissions and in terms of the nature of this particular case, the Court, at oral argument, offered that firm the opportunity to submit a new proposal if it wished, *see* Tr. 50, which it did and which the Court found more reasonable. Unlike an auction system, such modest intervention by the Court is fully consistent with the mandate of the Reform Act that the lead plaintiff's selection and retention of counsel be subject to a court approval that is meaningful and not simply perfunctory. *See* § 78u–4(a)(3)(B)(iii)(II)(v).

■ Under the approach mandated by the Reform Act, however, the primary focus must always be, not on the selection of counsel, but on the selection of lead plaintiff. An inherent difficulty with all class actions is that the voices of the real parties in interest may not be heard. The connection of plaintiff's counsel to the unnamed (and frequently unknown) members of the putative class is tenuous at best, and where even the named plaintiffs exercise no meaningful oversight over their counsel, the class action becomes little more than a lawyer's playground. In the case of securities class actions, Congress directed the courts to attempt to mitigate this problem by appointing as lead plaintiff the member(s) of the putative class most likely to exercise genuine supervision over their counsel and the conduct of the litigation.

■ In the instant case, for the reasons already enunciated, none of the movants' proposals seems likely to satisfactorily serve these functions or otherwise adequately meet the requirements of the Reform Act. The substantial information provided by the movants has nonetheless given the Court a solid basis on which to make a determination of who should be lead plaintiff. Specifically, it emerged that Fahnestock is a division of a very large financial institution, with funds under management worth $1.2 billion as of December 31, 1999, *see* Lexis–Nexis Company Reports, Fahnestock Viner Holdings Inc. (2001), and that Fahnestock has the largest financial stake in this litigation ($2.6 million) of the plaintiffs who are typical of the class or not otherwise disqualified from acting as lead plaintiff. Indeed, Fahnestock closely fits the profile of the kind of lead plaintiff Congress had in mind when it enacted the Reform Act, *see* H. Conf. R. 104–369, *reprinted in* 1995 U.S.C.C.A.N. 730, 733–34. Consequently, the Court has no hesitation in appointing Fahnestock as lead plaintiff.

Fahnestock had initially selected as its counsel the relatively small firm of Schiffrin & Barroway LLP. Subsequently, with the broadening of the case, Fahnestock was among the movants comprising the "Azimut Group" that sought to retain, on behalf of that disparate group, no fewer than three law firms as lead counsel and two other law firms as members of the "Executive Committee" to represent that "lead plaintiff." At oral argument, however, it emerged that one counsel in particular, Milberg Weiss, had not only drafted the initial complaint in this case—itself arguably a relevant factor in the selection of lead counsel, *see* § 78u–

4(a)(3)(B)(iii)(I)(aa)—but also had played the primary role in organizing the case for all members of the Azimut Group including Fahnestock. *See, e.g.,* Tr. 10. Subsequent written submissions, *see, e.g.,* letter dated Feb. 22, 2001 from Milberg Weiss and Schiffrin & Barroway (under seal), confirmed that Fahnestock, if it were to be lead plaintiff, wished both Schiffrin & Barroway LLP and Milberg Weiss to serve as its counsel. Once satisfied that these firms' proposed fee arrangements (though subject to further review at the end of the case) were at least presumptively reasonable, *see* letter of Feb. 22, 2001, *supra,* and that both firms were otherwise fully capable of serving as lead counsel, the Court approved their retention as co-lead counsel for lead plaintiff Fahnestock.

Accordingly, it was for the foregoing reasons that the Court issued its order of February 22, 2001 appointing Fahnestock Asset Management as lead plaintiff and the firms of Schiffrin & Barroway LLP and Milberg Weiss Bershad Hynes & Lerach LLP as lead counsel.