## In re INDEPENDENT ENERGY HOLDINGS PLC SECURITIES LITIGATION.

No. 00 CIV. 6689(SAS).

United States District Court, S.D. New York.

May 28, 2002.

See, also, 2002 WL 31453790.

Jeffrey A. Klafter, Esq., Bernstein Litowitz Berger & Grossman LLP, New York City, for Lead Plaintiffs.

Lawrence Portnoy, Esq., Davis Polk & Wardwell, New York City, for Opposing Defendants.

Jonathan L. Hochman, Esq., Schindler Cohen & Hochman, New York City, for Individual Defendants.

James Ringer, Esq., Clifford Chance Rogers & Wells LLP, New York City, for Independent Energy UK Ltd.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

This is a securities class action brought on behalf of investors in a company whose securities essentially became worthless overnight, Independent Energy Holdings PLC ("Independent Energy" or the "Company").[1] The defendants include Independent Energy, the underwriters of a secondary offering ("Underwriter Defendants"), two companies related to those underwriters ("Related Defendants"), and several officers and directors of Independent Energy (the "Individual Defendants").[2] On December 20, 2000, this Court appointed Thomas R. Becnel, J.B. Prudhomme, Floyd D. LeBleu, and Robert C. Maison as lead plaintiffs under the Private Securities Litigation Reform Act ("PSLRA"). *See* 15 U.S.C. § 78u–4.

The lead plaintiffs now move to be appointed as representatives of a class seeking certi-

---

**1.** This action is the consolidation of eighteen separate actions brought between September 6, 2000 and February 7, 2001. Claims are asserted under sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §§ 77k(a), 77l(a)(2), and 77o, and sections 10(b)(5) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §§ 78j(b) and

78t(a), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5.

**2.** Burt H. Keenan, Executive Chairman of the Company's Board of Directors and one of its largest shareholders, is an Individual Defendant. *See* Second Consolidated Amended Class Action Complaint ("SAC") ¶ 27.

fication under Rule 23 of the Federal Rules of Civil Procedure. The proposed class consists of all persons or entities, from February 14, 2000 through September 8, 2000 ("Class Period"), who: (1) purchased or acquired Independent Energy American Depository Shares ("depository shares") that were issued in a secondary offering pursuant or traceable to the Registration Statement and Prospectus filed with the Securities and Exchange Commission ("SEC") on Form F–3 that was declared effective on March 28, 2000; (2) otherwise purchased or acquired those depository shares; (3) if residing in the United States or its territories, purchased or acquired ordinary shares of Independent Energy; (4) or any combination thereof.[3] For the reasons fully set forth below, the lead plaintiffs' motion is granted and the above described class is certified with the exception of Thomas R. Becnel acting as class representative.

## I. FACTS

The following is a brief recitation of the facts.[4] Founded in 1996, Independent Energy was formed to capitalize on market opportunities created by the deregulation of the energy markets in the United Kingdom ("U.K.").[5] *See* SAC ¶ 77. Independent Energy was the holding company for Independent Energy UK, a wholly owned subsidiary that was responsible for conducting Independent Energy's electricity operations. *See id.* ¶ 22.

In 1999, Independent Energy entered the market for small business and residential customers, generally known as the sub–100 kilowatt market. *See Independent Energy Holdings,* 154 F.Supp.2d at 749–50. By October of 1999, the Company began experiencing billing problems in this market. *See*

SAC ¶ 92. Indeed, the seriousness of the Company's billing problems drew the attention of the U.K.'s energy regulator, the Office of Gas & Electricity Markets ("OFGEM"). *See id.* ¶ 97. In February 2000, OFGEM commenced a formal investigation. *See id.* ¶ 102.

The Company's billing problems in the sub–100 kilowatt market also began to impact its liquidity. *See id.* ¶ 113. In need of funds, the Company decided to pursue another secondary offering ("Secondary Offering") of depository shares.[6] The SEC declared the Company's Registration Statement and Prospectus for its Secondary Offering effective on March 28, 2000. *See id.* ¶ 118. The Company raised approximately $157.6 million through this Secondary Offering. *See id.*

Approximately six weeks after the Secondary Offering, OFGEM prohibited Independent Energy from taking on any new domestic or small business electricity customers until it improved its performance. *See id.* ¶ 121. Nonetheless, Independent Energy failed to remedy its billing problems. On September 8, 2000, the Company announced that receivers had stepped in on behalf of its lenders and begun liquidating the Company. *See id.* ¶ 144. Trading in Independent Energy depository shares was halted that same day at $7.56 per share. *See id.* As of March 20, 2001, Independent Energy depository shares were trading at $0.005 per share on the over-the-counter market. *See id.* ¶ 146.

Plaintiffs' claims are based on several allegedly false and misleading statements and omissions of material facts contained in Independent Energy's Registration Statement and Prospectus as well as various public statements made by the defendants throughout the Class Period. These statements and

---

**3.** The proposed class excludes the defendants and their affiliates.

**4.** The facts were previously summarized in this Court's Opinion denying defendants' motion to dismiss; familiarity with the opinion is assumed. *See In re Independent Energy Holdings PLC Sec. Litig.,* 154 F.Supp.2d 741 (S.D.N.Y.2001).

**5.** In deciding a Rule 23 motion for class certification, the allegations set forth in the complaint are accepted as true. *See In re Blech Sec. Litig.,* 187 F.R.D. 97, 100 (S.D.N.Y.1999) (citing, *inter*

*alia, Shelter Realty Corp. v. Allied Maint. Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir.1978)).

**6.** Independent Energy completed an initial public offering in the United States in July of 1998, at which point its depository shares began trading on the NASDAQ National Market. *See id.* ¶ 84. In September of 1999, Independent Energy issued over 10 million depository shares through a first secondary offering of shares. *See id.* ¶ 88.

omissions concern, *inter alia*, the following: (1) the cause of the Company's billing problems; (2) the system and software modifications deployed to correct the Company's billing problems; and (3) OFGEM's monitoring and investigation of the Company. *See id.* ¶¶ 149–59, 197, 205, 207. Claims have been brought under the 1933 Act and the 1934 Act, although the former is only prosecuted by lead plaintiff Robert Maison.

## II. LEGAL STANDARD

■ Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure.[7] The requirements of Rule 23 are to be applied liberally, not restrictively. *See Blech,* 187 F.R.D. at 102 (citing *Korn v. Franchard Corp.,* 456 F.2d 1206, 1208–09 (2d Cir.1972)). A liberal standard is in accord with this Circuit's preference for the use of class actions in securities law claims. *See In re Avon Sec. Litig.,* No. 91 Civ. 2287, 1998 WL 834366, at *4 (S.D.N.Y. Nov.30, 1998) (noting importance of class actions in enforcing securities laws where numerous investors have been injured but not to the point of pursuing suit individually) (citing *Green v. Wolf,* 406 F.2d 291, 298 (2d Cir.1968)); *see also Blech,* 187 F.R.D. at 102 ("Class action treatment of related claims is particularly appropriate when plaintiffs seek redress for violations of the securities laws."). Accordingly, in securities cases, "when a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward." *Blech,* 187 F.R.D. at 102.

## III. RULE 23(A) REQUIREMENTS—IN GENERAL

### A. Numerosity

■ The first two requirements of Rule 23(a), numerosity and commonality, are not in dispute. Nonetheless, I shall briefly address both because all the requirements of Rule 23 must be met prior to class certifica-

tion. Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Impracticability does not mean impossibility of joinder, but refers to the difficulty or inconvenience of joinder. *See Avon,* 1998 WL 834366, at *5 ("[J]oinder of all members need not be impossible, but only impracticable in the sense that joinder would 'needlessly complicate and hinder efficient resolution of the litigation.' ") (quoting *Trief v. Dun & Bradstreet Corp.,* 144 F.R.D. 193, 198 (S.D.N.Y.1992)). While precise calculation of the number of class members is not required, *see Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir.1993), numbers in excess of forty generally satisfy the requirement. *See Trief,* 144 F.R.D. at 198.

Lead plaintiffs believe that thousands of investors engaged in transactions during the Class Period involving the securities that are the subject of this litigation. *See* Lead Plaintiffs' Memorandum of Law in Support of Motion for Class Certification at 12. This belief is well supported in fact—during the relevant period, there were more than 40.7 million ordinary shares of Independent Energy issued and outstanding, 22.5 million of those shares trading as depository shares of which 4.07 million were sold through the Secondary Offering. *See id.* Given the volume of ordinary and depository shares that were being traded, it is obvious why the numerosity element is not contested.

### B. Commonality

■ Under Rule 23(a)(2), plaintiffs must show that "common issues of fact or law affect all class members." *Trief,* 144 F.R.D. at 198. The commonality requirement has been applied permissively in securities fraud litigation. *See Blech,* 187 F.R.D. at 104. In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied. *See, e.g., Blackie v. Barrack,* 524 F.2d 891, 902 (9th Cir.1975) ("Confronted with a class of purchasers al-

---

**7.** a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or

defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

legedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable. . . ."); *In re Baldwin–United Corp. Litig.*, 122 F.R.D. 424, 426 (S.D.N.Y.1986) ("The nub of plaintiffs' claims is that material information was withheld from the entire putative class in each action, either by written or oral communication. Essentially, this is a course of conduct case, which as pled satisfies the commonality requirement of Rule 23. . . .").

The instant action involves material misrepresentations and omission in written publications circulated to the investing public or filed with the SEC or both. As such, the following questions of law or fact are common to all class members:

1) Whether the acts and omissions of the defendants violated the federal securities laws;

2) Whether defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts;

3) Whether the market price of Independent Energy ordinary or depository shares was artificially inflated due to the material nondisclosures and/or misrepresentations; and

4) Whether the class members have sustained damages as a result of the forgoing and, if so, the proper measure of such damages.

In light of the above, there is no doubt that the commonality requirement is satisfied in this case.

## C. Typicality

■ The remaining two requirements of Rule 23(a), typicality and adequacy, are disputed. *See infra* Part IV. The typicality requirement is established where:

the claims of the representative Plaintiffs arise from the same course of conduct that gives rise to the claims of the other Class members, where the claims are based on the same legal theory, and where the class members have allegedly been injured by the same course of conduct as that which

allegedly injured the proposed representatives.

*In re NASDAQ Market–Makers Antitrust Litig.*, 172 F.R.D. 119, 126–27 (S.D.N.Y. 1997). *See also Robidoux*, 987 F.2d at 936–37 ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims."); *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir.1992) (typicality requirement satisfied where plaintiffs' claims arise "from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability").

" 'While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.' " *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir.1990) (internal citation omitted)). "Regardless of whether the issue is framed in terms of the typicality of the representative's claims . . . or the adequacy of [their] representation . . . there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to [him]." *Gary Plastic*, 903 F.2d at 180.

## D. Adequacy of Representation

"Under Rule 23(a)(4), adequacy of representation is measured by two standards. First, class counsel must be qualified, experienced and generally able to conduct the litigation. Second, the class members must not have interests that are antagonistic to one another." *Drexel*, 960 F.2d at 291 (citation and internal quotation marks omitted). In other words, the representatives and their attorneys must be able to prosecute the action vigorously. *See Blech*, 187 F.R.D. at 106.

## IV. CONTESTED ISSUES

### A. The Lead Plaintiffs, With One Exception, Are Typical

The Underwriter and Related Defendants ("opposing defendants") argue that lead plaintiffs Becnel, LeBleu and Prudhomme (collectively the "Lafayette Investors") are not typical representatives of the putative class because they may be subject to a unique defense regarding their relationship with Burt Keenan. Because Becnel's relationship with Keenan may expose him to such a unique defense, he is not a typical representative of the putative class. However, as discussed below, this is not a concern with respect to LeBleu and Prudhomme.

To establish their claims under Rule 10b–5, plaintiffs must prove that they relied upon the integrity of the market price in purchasing their securities. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 243, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Although such reliance may be presumed, it also may be rebutted. *See id.* at 248–49, 108 S.Ct. 978. Accordingly, where plaintiffs are privy to non-public information not available to other investors, they may be subject to unique reliance defenses making them atypical and inadequate class representatives. *See Beck v. Status Game Corp.*, No. 89 Civ. 2923, 1995 WL 422067, at *4 (S.D.N.Y. July 14, 1995). Moreover, a unique defense need not be proven in order to defeat class certification. *See Landry v. Price Waterhouse Chartered Accountants*, 123 F.R.D. 474, 476 (S.D.N.Y. 1989) ("[W]hether these defenses will be successful is of no matter.... Each of these plaintiffs would be required to devote considerable time to rebut the claim that their purchases were based not on the integrity of the market, but on non-public information that they received.... Clearly, this situation would prejudice absent class members."). Defendants contend that the Lafayette Investors are subject to unique defenses and therefore cannot serve as adequate class representatives.

#### 1. Case Law

Courts generally must refrain from considering the merits of the substantive claims in deciding class certification motions. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). However, a court must make a preliminary determination of whether a unique defense to the claim of a potential class representative may shift the focus of the litigation to the detriment of the class members. If that is the case, then the claims of that plaintiff are atypical.

Courts have routinely found a disqualifying unique defense where the potential named plaintiff has had a direct or personal relationship with a board member or officer of the issuing company. For example, in *Beck*, the court found that plaintiff Goldberg based his decision to purchase Status stock not on public information but rather on information he received from defendant Yaffa, the Chairman of the Board, President, Chief Executive Officer and Director of Status. *See Beck*, 1995 WL 422067, at *3. In finding Goldberg atypical of other class members, the court stated:

> Goldberg faces a unique defense that renders his claim atypical of other class members. Goldberg testified in deposition that he met privately with Yaffa, the Chairman of the Board, President, Chief Executive Officer, and a Director of Status, to discuss Status. Goldberg indicated that this meeting influenced his decision to buy Status stock, and he stated that he had four or five subsequent conversations with Yaffa. Based on these statements ... Goldberg did not rely on public information in making his decision to purchase Status. This defense obviously will be unique to Goldberg because plaintiffs make no claim that each of the 4,000 persons who owned Status stock met with a member of the Status Board or had several conversations with a Board member. Thus, Goldberg faces a unique defense that could become, as it has already, the subject of considerable litigation. If Goldberg served as a class representative, plaintiffs' counsel would be required to devote considerable time to rebut this unique defense, thereby prejudicing absent class members.

*Id.* at *4 (citation and internal quotation marks omitted). Similar conclusions have been reached by courts confronted with

plaintiffs who have received non-public information from corporate officers.[8]

On the other hand, courts have consistently certified classes where there was no evidence that the named plaintiff received non-public information from a corporate officer. In *Cosmas v. DelGiorno*, No. CV–94–1974, 1995 WL 62598, at *3 (E.D.N.Y. Feb.8, 1995), defendants failed to rebut the presumption that plaintiff relied on the integrity of the market.

> [D]efendants point out that both plaintiff and his broker had numerous telephone conversations with [Computer Concepts' Chief Financial Officer] during the time he was making his purchases of stock. There is no assertion that the information discussed was otherwise unavailable to the public, or in any way constituted insider information. The fact of such conversations alone does not detract from Cosmas' basic contention that he relied on the integrity of the market in Computer Concepts stock, and that he purchased his stock in reliance on the allegedly misleading public statements made by the Company and its president.

*Id.* See also *Dietrich v. Bauer*, 192 F.R.D. 119, 125 (S.D.N.Y.2000) (nothing in the record indicated that plaintiff's decision to purchase Scorpion stock was based on information obtained from Scorpion's President who merely introduced plaintiff to Scorpion stock and sent him facsimiles of company's news releases); *Hallet v. Li & Fung, Ltd.*, No. 95 Civ. 8917, 1997 WL 621111, at *3 (S.D.N.Y. Oct.6, 1997) (defendants failed to present any evidence that plaintiff received inside information funneled to him by his father from company's president before he bought and sold the stock in issue).

In sum, atypicality has been found where there is evidence that the named plaintiff received information, either directly or indirectly, from an officer or director. Atypicality has not been found, however, when there is no evidence that inside information was shared despite the existence of some relationship between the named plaintiff and the officer or director.

### 2. Becnel

■ Opposing defendants argue that Becnel is subject to unique defenses given his relationship with Keenan and the conversations they had concerning Independent Energy. It is true that Becnel and Keenan have maintained a social relationship over the past twenty-two years, *see* Deposition of Thomas R. Becnel ("Becnel Dep."), Ex. 1 to the Affidavit of Lawrence Portnoy ("Portnoy Aff."), attorney for the opposing defendants, at 79, and have had various business dealings over the years. *See id.* at 154–55. In fact, it was Keenan who invited Becnel to participate in the Company's initial public offering.[9] Keenan also invited Becnel to participate in the Company's first secondary offering and gave him a detailed overview of the Company's operations and growth potential. *See id.* at 160–62. In sum, Keenan and Becnel spoke about the Company as many as twenty times in the last five years. *See id.* at 156–57. Becnel also testified that he relied on his relationship with Keenan when first purchasing Independent Energy shares and in deciding to stop selling shares after the Company went into receivership.[10] Given the extensive relationship between Becnel and Keenan, and the magnitude of information conveyed during that relationship, Becnel is an atypical plaintiff and should not act as a representative of absent class members. The unique

---

**8.** *See, e.g., Landry*, 123 F.R.D. at 476 (plaintiff who had access to information from corporate director deemed atypical); *Markewich v. Ersek*, 98 F.R.D. 9, 10–11 (S.D.N.Y.1982) (plaintiff whose decision to purchase stock was based upon a recommendation from a broker privy to inside information held to be an inadequate representative of the class); *Grace III v. Perception Tech. Corp.*, 128 F.R.D. 165, 169 (D.Mass.1989) ("Personal contact with corporate officers and special meetings at the company will render a plaintiff atypical to represent the class.").

**9.** *See id.* at 158 ("After some period of time, [Keenan] contacted me and asked me if I was interested in participating in the IPO, and that probably consisted of several conversations, and the receipt of some information.").

**10.** *See id.* at 80–81 ("I felt that he would not promote a company, particularly among the many friends he had in Louisiana, if he were not convinced that is was a good investment...."); *see id.* at 198 ("I stopped selling based upon his advice....").

defense of "non-reliance" on the integrity of the market would shift the focus of the litigation to the prejudice of the class members.

### 3. LeBleu and Prudhomme

▇ Opposing defendants attempt to create a typicality issue as to LeBleu and Prudhomme based on their familiarity with Becnel and other investors who knew Keenan, namely B.I. Moody and Jerome Stephen Young. LeBleu testified that he was friendly with Moody and Young, *see* Deposition of Floyd D. LeBleu ("LeBleu Dep."), Ex. 2 to Portnoy Aff., at 71, 162, both of whom knew and had conversations with Keenan regarding Independent Energy. *See id.* at 164. LeBleu further testified that he learned the contents of some conversations Young had with Keenan:

Q. Did anyone ever repeat to you anything that [Keenan] had said to them about Independent Energy?

A. Jerry Young did on a few occasions. . . . Jerry would simply say exactly what everybody else found out except that on occasions he spoke directly with Burt who said, yes, we got this worked out and here is where we are at and this is why we didn't go do that meeting, but it is no big deal, *but he said that just in confidence saying this thing is going to be all right.*

*Id.* at 165–66 (emphasis added). This statement is, however, ambiguous as it does not accurately identify the speaker: Does the "he" in the highlighted portion refer to Keenan or Young? Standing alone, this statement does not support a unique non-reliance defense as to LeBleu.

Defendants also hypothesize that LeBleu may have indirectly benefitted from Becnel's relationship with Keenan through LeBleu's financial advisor, John Price, to whom Becnel paraphrased a conversation he had with Keenan. *See* Becnel Dep. at 131–32. Defendants note, in this regard, that Becnel and LeBleu purchased Independent Energy stock on three identical dates. Opposing defendants further argue that Prudhomme may

have similarly indirectly benefitted from his association with Moody, with whom he discussed Independent Energy five or six times prior to his first purchase. *See* Deposition of J.B. Prudhomme ("Prudhomme Dep."), Ex. 3 to Portnoy Aff., at 49.

Both LeBleu and Prudhomme testified that they never had any communications with Keenan regarding Independent Energy. *See* LeBleu Dep. at 164; Prudhomme Dep. at 69. Likewise, Keenan testified that he never communicated with LeBleu or Prudhomme during the Class Period. *See* Deposition of Burt Keenan, Ex. E to the Declaration of Jeffery A. Klafter, attorney for Lead Plaintiffs, in Support of Lead Plaintiffs' Motion for Class Certification ("Klafter Decl."), at 54–55. With regard to indirectly acquired information, Moody testified that he first spoke with LeBleu about Independent Energy after it had entered receivership, not during the Class Period. *See* Deposition of B.I. Moody, Ex. F to Klafter Decl., at 28. Moody further testified that he did not discuss any conversation he had with Keenan with Prudhomme. *See id.* at 41. Young similarly testified that he never had a conversation with Prudhomme regarding Independent Energy. *See* Deposition of Jerome Stephen Young, Ex. G to Klafter Decl., at 24. As to LeBleu, Young testified that he and LeBleu never discussed anything that was not "out there in the general public" and that Keenan never provided him with any non-public information. *Id.* at 40, 57–58. Young's testimony is further supported by Keenan who testified that he never imparted any non-public information to Young. *See* Keenan Dep. at 55, 76, 87.

Nor do LeBleu's or Prudhomme's relationship with Becnel support a non-reliance defense. LeBleu testified that Becnel "never did say anything particular to me about Burt Keenan." LeBleu Dep. at 165.[11] Similarly, Prudhomme testified that he and Becnel never discussed any conversation Becnel may have had with Keenan concerning Independent Energy. *See* Prudhomme Dep. at 69. In fact, Becnel only spoke to LeBleu and Prudhomme on a few occasions during the Class Period and when he did, the conversa-

---

**11.** *See also* LeBleu Dep. at 172–73 ("I have no recollection and don't believe until the suit that

Tommy ever talked to me other than just general.").

tion concerned only generalities about Independent Energy. *See* Becnel Dep. at 71, 85. Finally, the fact that LeBleu and Becnel used the same investment advisor and purchased shares of Independent Energy on three identical days in the Class Period does not establish that their purchases were based on non-public information. In this regard, LeBleu testified that Price never pressured him to buy or sell and that he and Becnel never gave each other advice on whether to buy Independent Energy shares. *See* LeBleu Dep. at 82–83, 105.

In sum, the evidence that LeBleu or Prudhomme based their investment decisions on non-public information is insufficient to warrant excluding them as named plaintiffs. While the extent of any non-reliance on their part will certainly be a fact question to be decided at trial, it is unlikely to significantly shift the focus of the litigation to the detriment of the absent class members.

### B. The Remaining Lead Plaintiffs Are Adequate Class Representatives

Opposing defendants argue that the Lafayette Investors cannot fairly and adequately represent the proposed class because their credibility with respect to the essential element of reliance may be seriously challenged.[12] According to defendants, the impaired incentives of the Lafayette Investors to fully prosecute claims against Keenan and Independent Energy will further imperil their fiduciary duties to the class. Defendants also challenge Maison on various grounds, claiming he is an inadequate representative of those class members with section 11 claims. For reasons discussed below, defendants' adequacy arguments are insufficient to preclude LeBleu, Prudhomme and Maison from acting as class representatives.[13]

#### 1. LeBleu and Prudhomme

■ Opposing defendants further contend that LeBleu and Prudhomme are inadequate

class representatives because their testimony lacks credibility. However, speculation and generalized attacks on credibility are insufficient to defeat class certification. *See Hallet,* 1997 WL 621111, at *2–3 (denying challenge to class certification on grounds of typicality and adequacy where defendants relied on a "tenuous and unconvincing chain of circumstantial evidence" to prove that inside information was passed to the proposed class representative). The attenuated connections discussed above do little to refute the testimony of LeBleu and Prudhomme that they relied on the integrity of the market when purchasing and selling Independent Energy securities. *See* LeBleu Dep. at 63, 91–92; Prudhomme Dep. at 56, 73.

Defendants further argue that the personal and financial interests between the Lafayette Investors and Keenan strongly imperil their ability to impartially prosecute claims against Keenan and Independent Energy. Perhaps this was a concern before Becnel was disqualified as he was the only investor who had a direct relationship with Keenan. With Becnel not in the mix, however, defendants' argument loses steam. Furthermore, the fact that Keenan was named as a defendant is sufficient proof of lead plaintiffs' ability to vigorously prosecute their claims against both Keenan and Independent Energy.

In sum, there is no evidence that the credibility of LeBleu and Prudhomme will be challenged to the extent of rendering them inadequate class representatives. Nor is there evidence that the two remaining lead plaintiffs cannot adequately prosecute their claims against Keenan. Moreover, any conflicts that do develop within the certified class may be resolved by appointment of replacement class representatives. Accordingly, LeBleu and Prudhomme are appointed as class representatives for all non-section 11 class members.

---

12. Defendants do not challenge the capability of lead plaintiffs' counsel to pursue this litigation.

13. Because Becnel is subject to unique defenses and is therefore precluded from serving as a

class representative, there is no need to decide whether he is an "adequate" class representative.

## 2. Maison

■ Because the Lafayette Investors did not purchase shares in the Secondary Offering, they are not asserting any section 11 claims. Accordingly, lead plaintiffs request that Maison be appointed as the class representative of the section 11 claims. Opposing defendants now argue that Maison cannot adequately represent those class members for three reasons: (1) Maison has yet to meet and speak with the Lafayette Investors;[14] (2) Maison's small stake in the litigation; and (3) Maison's inability to differentiate between his section 11 claim and the Lafayette Investors' section 10(b) claims. *See* Memorandum of Law in Support of the Underwriter and Related Defendants' Opposition to Lead Plaintiffs' Motion for Class Certification ("Def.Mem.") at 22–23.

The record in this case undermines any challenges to Maison's adequacy by amply demonstrating his knowledge and involvement in this litigation. Maison has reviewed the pleadings in this case, *see* Deposition of Robert C. Maison, Ex. D to Klafter Decl., at 31–32, 35, 38 and 41, communicates regularly with counsel concerning the litigation, *see id.* at 80, and knows all of the substantive facts of the case. *See id.* at 96–98, 102–05 and 149. Maison is also keenly aware of his fiduciary responsibilities as a lead plaintiff and class representative, if appointed. *See id.* at 53, 64. Although he initially testified that all claims against the underwriters were based on fraud, *see id.* at 108, he subsequently differentiated between the standards applicable to section 11 and section 10(b) claims. *See id.* at 153–54. Maison's earlier misstatement does not significantly weigh against his adequacy given his overall knowledge and understanding of the case. *See Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 124 (S.D.N.Y. 2001) (finding proposed class representatives adequate given their awareness of essential facts and issues in the case despite defendants' claims that representatives were unable "to describe the legal claims asserted against particular defendants").

Furthermore, Maison's limited financial stake in this litigation does not preclude him from acting as a class representative for a number of reasons. *First*, Maison's alleged loss of approximately $50,000, while significantly less than the losses alleged by the Lafayette Investors, is substantial in its own right. *Second*, the appointment of lead plaintiff is not synonymous with the designation of class representatives.

> While the PSLRA does have a statutory presumption with respect to the amount of loss involved for selecting *lead plaintiffs*, neither the statute nor Rule 23 contains the same presumption for selection of *class representatives....* A lead plaintiff is not synonymous with a class representatives, and in the ordinary course of litigation the class representative will not appear on the scene until long after the lead plaintiff. No lead plaintiff is compelled to serve as a class representative. While the PSLRA defines the qualifications and selection process for lead plaintiff, the class representative is selected not pursuant to the PSLRA, but pursuant to Rule 23.

*In re Oxford Health Plans, Inc. Sec. Litig.*, 199 F.R.D. 119, 125 (S.D.N.Y.2001) (emphasis in original). To require a class representative to have a large financial stake in the litigation is unnecessary as one purpose of the class action device is to permit litigation to proceed where the cost of pursuing individual actions is prohibitive. *See Blech*, 187 F.R.D. at 107 ("[A]lthough a large number of individuals may have been injured, no one person may have been damaged to a degree which would induce him to institute litigation solely on his own behalf.").[15]

14. Opposing defendants argue that the only connection between Maison and the Lafayette Investors is that they are represented by the same counsel. If this is so, defendants argue that this contravenes one purpose of the PSLRA which was to replace lawyer-driven litigation with client-driven litigation in securities class actions. *See In re Razorfish, Inc. Sec. Litig.*, 143 F.Supp.2d 304, 308 (S.D.N.Y.2001).

15. Opposing defendants urge this Court to reconsider the appointment of lead plaintiffs on the ground that without Becnel, the financial interests of the remaining Lafayette Investors is substantially less than two of the other proposed lead plaintiff groups, thereby rebutting the presumption found in 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(bb). *See* Def. Mem. at 20. However, that presumption "may be rebutted only upon proof *by a member of the purported*

## C. Rule 23(b)(3)

█ In addition to meeting the requirements of Rule 23(a), a potential class action must satisfy at least one of the three conditions found in Rule 23(b). Lead plaintiffs request class certification pursuant to Rule 23(b)(3) which states:

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \*

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b).

In determining whether common questions of fact predominate, a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class. Indeed, "[w]hen determining whether common questions predominate courts 'focus on the liability issue . . . and if the liability issue is common to the class, common questions are held to predominate over individual questions.'" *Genden v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 114 F.R.D. 48, 52 (S.D.N.Y.1987) (quoting *Dura–Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 93 (S.D.N.Y.1981)). The Supreme Court has also noted that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud. . . ." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

The predominance requirement is easily satisfied here. While damage amounts may vary, the claims are based on a common legal theory of material misrepresentations and omissions such that common questions clearly predominate. There is also no question here that the class action device is superior to other methods of litigation. Class actions are generally well-suited to securities fraud cases, *see Green*, 406 F.2d at 295–96, in large part because "they avoid the time and expense of requiring all class members to proceed individually." *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318, 2000 WL 1357509, at *11 (S.D.N.Y. Sept.20, 2000). "As stated in *Dreyfus*, given the large number of potential plaintiffs and the commonality of their claims, certifying the class will permit a fairer and more efficient adjudication of the controversy." *Id.* Accordingly, the requirements of Rule 23(b) have been met.

## D. Limiting Plaintiffs' Section 11 Class; Subclasses

Opposing defendants argue that the section 11 class members should be limited to purchasers on the March Secondary Offering itself rather than those persons and entities who purchased depository shares "pursuant to and/or traceable to" the initial Registration Statement and Prospectus. Lead plaintiffs argue that this type of factual determination should not be decided on a motion for class certification or before discovery is completed. Whether the claims of the section 11 class members will be limited and, if so in what manner, will be discussed at the next court conference. The question of whether subclasses should be designated to differentiate between class members who are asserting section 11 claims and those who do not assert such claims will also be addressed. *See Blech*, 187 F.R.D. at 104 (in cases involving discrete but related claims, courts have designated subclasses under Rule 23(c)(4)).

## V. CONCLUSION

For the reasons stated above, the class proposed by lead plaintiffs is hereby certified

---

*plaintiff class* that the presumptively most adequate plaintiff—will not fairly and adequately protect the interests of the class; or is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u–4(3)(B)(iii)(II) (emphasis added). Here, no member of the plaintiff class has offered such evidence as to the adequacy of the remaining lead plaintiff group without Becnel.

Because the class will be adequately represented by counsel, with or without the inclusion of Becnel as a lead plaintiff, I decline to re-open the lead plaintiff process which would, under the circumstances, be an exercise in futility. *See Oxford*, 199 F.R.D. at 125 (stating that it is the class representative, not the lead plaintiff, that is going to control the case).

with the exception of Becnel acting as a class representative. A conference is scheduled for June 3, 2002 at 4:30 p.m. in Courtroom 12C. The topics to be discussed include designation of subclasses, limiting the section 11 class, and the outstanding discovery dispute resulting from the assertion of attorney-client privilege by the Individual Defendants. The Clerk of the Court is directed to close this motion.

SO ORDERED: